**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM HOUCK, Individually and On Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>          v.<br><br>EOS ENERGY ENTERPRISES, INC., JOSEPH MASTRANGELO, and NATHAN KROEKER,<br><br>                          Defendants. | Case No. 2:23-cv-04113-JKS-MAH<br><br>**SECOND CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**DEMAND FOR A JURY TRIAL** |

## **TABLE OF CONTENTS**

I.      NATURE OF THE ACTION AND OVERVIEW ..........................................1

II.     JURISDICTION AND VENUE ....................................................................4

III.    PARTIES ......................................................................................................5

IV.     SUBSTANTIVE ALLEGATIONS ................................................................7

      A.      Background .........................................................................................7

      B.      Because Eos Was Not Profitable, The Company Instead Focused The Market On Its Backlog Of Orders ........................................................7

      C.      Soon After The Business Combination, Iceberg Accused Eos Of Inflating Its Backlog With Customers That Were Unlikely To Fulfill Their Contracts ....................................................................................8

      D.      The Company Announces Record-Breaking Orders From Bridgelink Commodities And Analysts Take Notice That The Company Is Moving In A Positive Direction.......................................................................11

      E.      Iceberg Research Reveals That Eos's Largest Customer Was Highly Unlikely To Have The Funding To Pay Eos For Its Orders ...............22

      F.      Defendants Confirm That Bridgelink Commodities Does Not Have Financing For Its Projects With Eos ..................................................26

      G.      Bridgelink Power And Bridgelink Commodities Are Intertwined Entities Such That The Financial Risks To Bridgelink Power Impacted Bridgelink Commodities ..................................................................28

V.      MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ..................................................................36

VI.     LOSS CAUSATION ..................................................................................38

VII.    CLASS ACTION ALLEGATIONS ............................................................39

VIII.   UNDISCLOSED ADVERSE FACTS ........................................................41

IX.    ADDITIONAL SCIENTER ALLEGATIONS ............................................42

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)........................................................................44

XI.    NO SAFE HARBOR ...................................................................................47

XII.    CLAIMS FOR RELIEF ..............................................................................48

XIII.    PRAYER FOR RELIEF .............................................................................53

XIV.    JURY TRIAL DEMANDED.......................................................................54

Lead Plaintiff William Houck ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Eos Energy Enterprises, Inc. ("Eos" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Eos; and (c) review of other publicly available information concerning Eos.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Eos securities between May 9, 2023 and July 27, 2023, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants[1] under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Eos claims it designs, develops, manufactures, and markets zinc-based energy storage solutions for utility-scale, microgrid, and commercial & industrial ("C&I") applications.

---

[1] "Defendants" refers to Eos, Joseph Mastrangelo ("Mastrangelo"), and Nathan Kroeker ("Kroeker").

3.      On March 9, 2022, Eos announced the largest deal in the history of the Company.  As Eos stated in a press release that day, the Company had entered into a deal with Bridgelink Commodities, LLC ("Bridgelink Commodities") representing a total order value of up to $150 million, or nearly 75% of Eos' backlog at the time. Thereafter, on July 6, 2022, Eos announced another deal with Bridgelink Commodities that increased its order value to $181 million.  Analysts began to take notice of these deals and indicated that they believed the Company was moving in the right direction.  Over the next year, the Company continued to tout its order backlog to the market of which Bridgelink Commodities was the largest component.

4.      Bridgelink Power ("Bridgelink Power") was the parent entity of Bridgelink Commodities and numerous other entities. The Bridgelink entities were all related in that they were part of a family office run by the same individual. Bridgelink Power and certain of its related entities became embroiled in litigation after defaulting on a large, secured loan facility, in response to which the lender sought to seize the collateral, *i.e.*, the parent company's assets. As Bridgelink Power admitted in court filings, the seizure would "destroy" its entire renewable energy business, of which Bridgelink Commodities was certainly a part.

5.      In spite of this, Defendants failed to disclose anything about the situation at Bridgelink, including that the Company's largest customer could not finance its contracts for Eos's products or that the projects for which Bridgelink

Commodities had ordered batteries could be sold at auction. As such, there was an undisclosed material risk to the Company's booked order backlog, which was vital to the future of the business as it demonstrated market interest in the Company's product and was used by Defendants to raise funds and increase the stock value.

6.     On July 27, 2023, during market hours, Iceberg Research ("Iceberg") published a report that claimed that Bridgelink Power had defaulted on a secured loan facility approximately two months after Bridgelink Commodities had signed the first order with Eos and was embroiled in litigation with the lender to seize the parent company's assets.  Iceberg concluded that its findings "completely undermine the authenticity of EOS Energy's promoted backlog."

7.     On this news, the Company's stock price fell $0.83 per share, or 23.9%, to close at $2.65 per share on July 27, 2023, on unusually heavy trading volume.

8.     On July 27, 2023, after the market closed, Eos confirmed that Bridgelink Commodities did not have financing for the purportedly firm orders in Eos's backlog, which is why the customer was "actively seeking financing for energy storage projects covered by Eos's multi-year Master Supply Agreement."

9.     On this news, the Company's stock price fell $0.39 per share, or 14.7%, to close at $2.26 per share on July 28, 2023, on unusually heavy trading volume.

10.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the

Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Bridgelink Power, the parent company of Eos' largest customer, Bridgelink Commodities, defaulted on a secured loan facility and was embroiled in litigation with the lender to seize the parent's assets; (2) that the foregoing threatened Bridgelink Commodities' commitment and ability to purchase Eos products; (3) that, as a result, there was a material risk to Eos's backlog; and (4) that, as such, there was a material undisclosed risk to Eos's business, operations, and prospects.

11.     Defendants acted with scienter and must be held accountable for their wrongful acts and omissions which, as the true facts came to light, were the cause of a significant decline in the market value of the Company's securities. Plaintiff and other Class members have suffered significant losses and damages at the hands of Defendants and are entitled to redress.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

15.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.  PARTIES

16.    Lead Plaintiff William Houck, as set forth in the certification previously filed with the Court (Dkt. No. 1-2), incorporated by reference herein, purchased Eos securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.    Defendant Eos is incorporated under the laws of Delaware with its principal executive offices located in Edison, New Jersey. Eos's common stock

trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "EOSE" and its warrants trade under the symbol "EOSEW."

18.    Defendant Joseph Mastrangelo ("Mastrangelo") was Eos's Chief Executive Officer ("CEO") at all relevant times.

19.    Defendant Nathan Kroeker ("Kroeker") has been Eos's CFO since January 23, 2023.

20.    Defendants Mastrangelo and Kroeker (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background

21.    Founded in 2008 and headquartered in Edison, New Jersey, Eos claims it designs, develops, manufactures, and markets zinc-based energy storage solutions for utility-scale, microgrid, and C&I applications.

22.    Eos is the surviving entity after Eos Energy Storage, LLC was acquired in a business combination by a special purpose acquisition company ("SPAC") called B. Riley Principal Merger Corp. II on November 16, 2020 (the "Business Combination").

### B.   Because Eos Was Not Profitable, The Company Instead Focused The Market On Its Backlog Of Orders

23.    As Eos was not profitable, the Company touted its booked orders to the market.  In fact, both before and after the Business Combination, the Company announced each newly booked orders and included booked orders and order backlog in its quarterly financial highlights.  Moreover, the Company's executives would routinely talk about order backlog in earnings calls, often before any other financial information about the Company, and would specifically respond to analyst questions about it.

24.    The Company's order backlog was vital to the future of the business as it demonstrated market interest in the Company's products.  As such, Eos's executives were finely attuned to the details of the transactions that were announced

by the Company and were included in the Company's order backlog.  In fact, the Company's backlog was used by Defendants to raise funds and increase the stock value.  Defendant Kroeker confirmed management's attention to backlog when he stated in an August 15, 2023 earnings call that:[2]

> ***Each quarter, we assess the health of our reported backlog.***  Doing so requires us to exercise judgment about uncertain factors.  We sometimes come to the view that a project that was booked in the past is unlikely to materialize or a change order has been executed, in which case, we may adjust our backlog.  This assessment has resulted in projects being removed from our backlog in each of the last 2 quarters.

25.    Moreover, Defendants were certainly aware of the specifics of Eos' backlog because it reflected so few customers.  Specifically, even after the Class Period, the entire backlog only had 13 customers (and the Company had only shipped products to 12 customers in its history).  As Defendant Kroeker explained during the August 15, 2023 earnings call:

> While we've previously shipped products to 12 customers, our current backlog consists of 13 customers representing 2.2 gigawatt hours, which includes a mix of ultimate, developers, IPP's and industrial customers.

**C.    Soon After The Business Combination, Iceberg Accused Eos Of Inflating Its Backlog With Customers That Were Unlikely To Fulfill Their Contracts**

26.    On January 14, 2021, Iceberg issued a research report entitled, "EOS Energy ($EOSE): Fake Customers won't Recharge a Dead Battery."  Therein,

---

[2] All bold and italicized emphasis hereinafter is added unless otherwise noted.

Iceberg explained that Eos had only sold ten battery systems to customers since 2008, but reported an incredible surge in its order book just before the Business Combination. According to the report, this surge was attributable to companies that were unlikely to honor their obligations with Eos because they did not appear to have the funds to finance them. As the report explained:

**Behind EOS' announcements of huge contracts are companies unlikely to honour their obligations**

EOS was clearly struggling before the SPAC merger, having sold just ten battery systems to customers since 2008, representing a total of 3 MWh (the modest equivalent of 13 Tesla Powerpacks). Many of these battery systems were installed under pilot programs to test EOS' technology.

EOS has shown little commercial success, and if not for the merger, was unlikely to survive for more than a few months without raising additional capital. Auditor Deloitte highlighted in the company's FY19 financial statements that EOS "has stated that substantial doubt exists about the Company's ability to continue as a going concern."

Indeed, EOS has burnt $160m of investor monies over its 12 years of existence, and had just $6.5m cash on hand at the end of September 2020. Its recent performance for the first nine months of 2020 ("9M20") was not any better as 9M20 revenue plunged ~83% to $35k from $211k a year earlier. Its 9M20 net loss was $45m while equity was negative $229m.

However, lo and behold, EOS miraculously announced a flurry of customer commitments just before the SPAC merger. This brought EOS' order book to 3,000 MWh at the end of October, a thousand times its existing deployment of batteries.

\*      \*      \*

However, there is one problem with this rosy scenario: EOS has signed contracts with customers that are unlikely to have the financial ability

to pay for these contracts. Three named customers — which combined account for 1,680 MWh — in particular explain EOS' exploding orderbook: **Carson Hybrid Energy Storage** ("CHES"), **International Electric Power, LLC** ("IEP"), and **EnerSmart Storage LLC** ("EnerSmart"). These are our findings:

27.    The Iceberg report explained that these companies did not appear to be legitimate and had not acquired funding yet for these transactions.  For example, in regard to International Electric Power, LLC ("IEP"), Iceberg explained:

> EOS' largest customer IEP calls itself a "technology agnostic power producer which seeks to build, own and operate a portfolio of generation assets". Its website does not list any manager despite claims that "our senior managers have over 30 years of industry experience". We found this information on a hidden old web page: out of four managers, at least two have left the company. And while IEP was involved in energy projects in the mid-2015s, it does not seem to have been really active since then.

> EOS has agreed to supply IEP with 1 GWh of battery energy storage systems in connection with the Electric Reliability Council of Texas ("ERCOT") grid. We found no trace of IEP on the ERCOT website nor did we find any relationship between ERCOT and IEP. A press article reports: "IEP is yet to identify the exact locations where the systems will be sited." We wonder how IEP can order 1GWh of batteries if they don't know yet where to put them.

28.    On this news, the Company's stock price fell 13.6% to close at $24.56 per share on January 14, 2021.

29.    Following the issuance of this Iceberg report calling into question certain of Eos's customers' legitimacy and ability to fund transactions, it would have been severely reckless for the Individual Defendants not to have been actively monitoring its largest customer's ability to pay for its booked orders with Eos.

Additionally, the Individual Defendants were aware of the particulars of these transactions and the financial condition of its largest customer, or if they were unaware, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiff and other Class members.

**D.    The Company Announces Record-Breaking Orders From Bridgelink Commodities And Analysts Take Notice That The Company Is Moving In A Positive Direction**

30.    On March 9, 2022, Eos announced the largest deal in the history of the Company.  As Eos stated in a press release that day, the Company had entered into a deal with Bridgelink Commodities representing a total order value of up to $150 million, or nearly 75% of Eos' backlog.   The press release, entitled "Eos Energy Enterprises Secures Record-Breaking Order from Bridgelink Commodities, LLC.," in relevant part, stated:

> Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos"), a leading provider of safe, scalable, efficient, and sustainable zinc-based energy storage systems, today announced it entered into a master supply agreement with Bridgelink Commodities, LLC ("Bridgelink") for proposed storage projects across Texas. ***Bridgelink has committed to purchase 240 MWh of energy storage capacity provided by Eos's Znyth™ zinc-based technology, accompanied by an option to purchase long-term maintenance support, with an additional option to expand to a total of 500 MWh over a term of 3 years, representing a total order value of up to $150 million.*** Bridgelink, which has over 8 GW of renewable generation projects in development, will rely on Eos technology to support energy curtailment recapture, providing resilience to the local power grid overseen by the Electric Reliability Council of Texas ("ERCOT").
>
> *                 *                 *

11

> "***With this partnership, our backlog grows to more than $200 million and is rapidly approaching 1 GWh.*** We continue to make real progress towards our $400 million booked order target for 2022 with a commercial opportunity pipeline of more than $4 billion," said Balki Iyer, Chief Commercial Officer of Eos.

31.     On May 9, 2022, the Company filed its Form 10-Q with the SEC for the quarter ended March 31, 2022. Therein, the Company stated in its "Company Highlights" section:

> In March 2022, the Company entered into a master supply agreement with Bridgelink Commodities, LLC ("Bridgelink") for storage projects across Texas. Bridgelink has committed to purchase 240 MWh of energy storage capacity provided by Eos's Znyth™ zinc-based technology, accompanied by an option to purchase long-term maintenance support, with an additional option to expand to a total of 500 MWh over a term of 3 years, representing a total order value of up to $150 million.

32.     On May 10, 2022, the Company issued a press release titled "Eos Energy Enterprises Reports First Quarter 2022 Financial Results." Therein, the Company, in relevant part, stated:

> Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos"), a leading provider of safe, scalable, efficient, and sustainable zinc-based energy storage systems, today announced financial results for the first quarter ended March 31, 2022.
>
> **First Quarter Highlights**
>
> - ***Continued commercial pipeline growth; booked orders of $67 million year-to-date resulting in orders backlog of $212 million with a current opportunity pipeline of over $6 billion.***
>
> *             *             *
>
> **Recent Business Highlights**

\*     \*     \*

- ***In March 2022, Bridgelink Commodities, LLC signed a three-year master supply agreement with a total potential order value of up to $150 million. Minimum order commitment under the agreement for 240 MWh with an option to increase to 500 MWh and an additional option to purchase long-term service support.***

33.     Analysts took notice of the Bridgelink Commodities announcement. For example, on May 10, 2022, Evercore ISI issued an analyst report about Eos entitled "Large Project Pipeline Increasing."   Therein, Evercore reiterated its Outperform rating for the Company and noted:

> Building the Backlog. ***EOSE backlog grew to $212.4 million at the end of the first quarter, consisting of 827 MWh for 28 projects across 15 customers.*** The company booked orders of $67 million in Q1 while its current commercial opportunity pipeline grew to over $6 billion. Demand for energy storage continues to grow, while there is a shortage of supply for product given the challenging supply chains. This is leading to customers to approach them about use cases for its battery technology and the timeline around when they can get product to market. ***Customers are also approaching them earlier in the deal cycle, which allows EOSE to have better visibility.*** Its backlog is also benefitting from higher pricing, which is increasing pipeline value.

34.     Similarly, on June 29, 2022, Guggenheim Securities, LLC, issued an analyst report entitled, "A Path Forward for EOS Energy."   The report, in relevant part, stated: "EOSE is scaling its manufacturing efforts and still appears likely to emerge from this year with ~$500 million in backlog — which we view as a testament to the viability of the company's technology."

35.    On July 6, 2022, Eos announced another deal with Bridgelink Commodities that increased its order value to $181 million.  The press release announcing the transaction, entitled "Eos Energy Enterprises, Inc. Secures Over 1 GWh in New Orders, More Than Doubles Backlog to Over $460 Million," in relevant part, stated:

> Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos"), a leading provider of safe, scalable, efficient, and sustainable zinc-based energy storage systems, today announced the signing of two significant orders with Bridgelink Commodities, LLC ("Bridgelink") and a leading Northeast solar developer totaling 1.1 GWh of energy storage capacity to be delivered over the next three years.
>
> **Bridgelink increased its multi-year master supply agreement ("MSA") to 1 GWh for deliveries over the next three years with an incremental order value of $181 million for new project installations. In addition, Eos will manufacture a separate 40MWh order valued at $13 million for fourth quarter 2022 delivery.**
>
> "We've built a strong working relationship with Eos and are proud to bring American-made technology to the ERCOT market in Texas," said Bull Flaherty, Managing Director at Bridgelink. "Eos' technology allows us the flexibility to meet the growing demand profile of ERCOT and bring more power to US consumers when needed."
>
> *        *        *
>
> "Over the past six months our opportunity pipeline increased to more than 20GWh, and we are excited to start seeing those opportunities convert into orders," said Joe Mastrangelo, CEO of Eos. "These orders fit perfectly with our ongoing manufacturing capacity expansion which we began late last year. Growing our relationship with customers like Bridgelink demonstrates how our flexible technology allows our customers to serve a variety of use cases."

14

36.     On July 6, 2022, Evercore ISI, issued another analyst report that focused on backlog.  That report, entitled "Backlog More Than Doubles; Momentum Accelerating," stated in relevant part:

> Not An R&D Project; This Is An Operating Business. Despite many battery and battery storage entities which remain in trial phases EOS is an operating business that is scaling its manufacturing capacity in-line with rapidly growing customer demand. ***The company was awarded two significant orders from Bridelink [sic] affiliates including an increase to the companies' MSA to 1 GWh ($181 million) to be delivered over the next three years plus a 40 MWh order for $13 million to be delivered in 4Q22. This equipment is destined for the ERCOT market in Texas***. In addition, a 300 MWh MSA was added for front of the meter stand-alone storage plus solar applications with a leading Northeast solar developer. As we alluded to in our takeaways note from our recent Clean Energy & Transition Technologies Summit we believed the company was on the cusp of several major new awards. ***The company experienced an acceleration in its pipeline doubling in the last six months (to more than 20 GWh)*** and is scaling up its manufacturing capacity (160 employees outside of Pittsburg) from 250 to 800 MWh capacity for long term secular growth. The factory is a place where customers can visit an operating company and see it is not a technology development company; a key differentiated in the rapidly developing battery storage market.

37.     That same day, Seaport Research Partners issued an analyst report that focused on the Company's backlog, entitled "EOSE wins Bridgelink MSA expansion that more than doubles backlog, appears at another politically-positive event -- both bullish," recognizing: "Today, EOSE announced 1.1 GWh of new awards that have taken its order backlog to over $460MM, up more than 115% from its end-1Q22 level of $212.4MM."

38.    On July 9, 2022, Eos issued a press release titled "Eos Energy Enterprises, Inc. Secures Over 1 GWh in New Orders, More Than Doubles Backlog to Over $460 Million." Therein, the Company, in relevant part, stated:

Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos"), a leading provider of safe, scalable, efficient, and sustainable zinc-based energy storage systems, today announced the signing of two significant orders with Bridgelink Commodities, LLC ("Bridgelink") and a leading Northeast solar developer totaling 1.1 GWh of energy storage capacity to be delivered over the next three years.

**Bridgelink increased its multi-year master supply agreement ("MSA") to 1 GWh for deliveries over the next three years with an incremental order value of $181 million for new project installations. In addition, Eos will manufacture a separate 40MWh order valued at $13 million for fourth quarter 2022 delivery.**

"We've built a strong working relationship with Eos and are proud to bring American-made technology to the ERCOT market in Texas," said Bull Flaherty, Managing Director at Bridgelink. "Eos' technology allows us the flexibility to meet the growing demand profile of ERCOT and bring more power to US consumers when needed."

Additionally, a 300 MWh MSA was signed with a leading Northeast solar developer for front of the meter stand-alone storage and solar plus storage applications that provide energy shifting and ancillary services with deliveries forecasted over the next three years.

Eos Znyth™ battery technology can be used for front-of-meter grid installations and behind-the-meter industrial applications among other use cases. The zinc-powered batteries can be deployed as both standalone storage and paired with renewables on the electric grid in addition to being used in commercial & industrial facilities.

"Over the past six months our opportunity pipeline increased to more than 20GWh, and we are excited to start seeing those opportunities convert into orders," said Joe Mastrangelo, CEO of Eos. "These orders fit perfectly with our ongoing manufacturing capacity expansion which we began late last year. Growing our relationship with customers like

16

Bridgelink demonstrates how our flexible technology allows our customers to serve a variety of use cases."

39.    On August 1, 2022, the Company filed its Form 10-Q with the SEC for the quarter ended June 30, 2022. Therein, the Company stated in its "Company Highlights" section:

In March 2022, the Company entered into a master supply agreement with Bridgelink Commodities, LLC ("Bridgelink") for storage projects across Texas (the "Bridgelink MSA"). Bridgelink committed to purchase 240 MWh of energy storage capacity provided by Eos' Znyth™ zinc-based battery technology, accompanied by an option to purchase long-term maintenance support, with an additional option to expand to a total of 500 MWh over a term of 3 years, representing a total order value of up to $150 million.

\*        \*        \*

In June 2022, Bridgelink Commodities, LLC increased the Bridgelink master supply agreement to 1 GWh of energy storage systems for deliveries over the next three years with an incremental order value of $181 million for new project installations and also issued a separate 40 MWh order valued at $13 million for fourth quarter 2022 delivery.

40.    On August 2, 2022, the Company issued a press release titled "Eos Energy Enterprises Reports Second Quarter 2022 Financial Results." Therein, the Company, in relevant part, stated:

Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos"), a leading provider of safe, scalable, efficient, and sustainable zinc-based energy storage systems, today announced financial results for the second quarter ended June 30, 2022.

**Second Quarter Highlights**

- $5.9 million in revenue, a 79 percent sequential increase and 28 percent higher compared to full year 2021 revenue.

17

- Booked orders in second quarter of $257.5 million, almost 4x higher than first quarter; year-to-date booked orders now stands at $324.7 million.

- **Orders backlog more than doubled in the quarter to $457.3 million.**

41.    On August 2, 2022, Evercore ISI also issued an analyst report that focused on the Company's backlog growth, explaining that Eos was a "compelling investment" because of its "strong backlog growth" and valuable technology. The report, entitled "Backlog Building, Revenue and Earnings Growth On The Come," in relevant part, stated:

> **Backlog Surging**. We continue to view EOSE as a compelling investment in the major energy storage theme, **driven by strong backlog growth** and an established long-duration technology capable of outperforming lithium-ion solutions. . . .
>
> **Strong Orders. EOSE's backlog grew to $457.3M (vs. $212.4M in 1Q), representing ~1.9GWh. The company booked orders of $324.7M compared to $67.1M in 1Q while its opportunity pipeline increased to $7.0 billion, representing 27GWh**. While energy storage demand grows globally, renewable developments slowed due to inflation and global supply chain constraints which resulted in an increased competition to secure lithium for battery production. However, EOSE's unique zinc based energy storage systems and supply chain network that utilizes 85% domestic products allowed the company to be less susceptible to cost inflation and to be ready to deliver products on time. This should allow EOSE to continue capturing market share. Visits to the Turtle Creek facility (which is running, and expanding) are helping to deliver orders. We plan to visit ourselves in a few weeks.

42.    On August 3, 2022, Guggenheim Securities, LLC also issued an analyst report that noted Eos's success in new bookings. The report, entitled "EOSE: Steps in the Right Direction," in relevant part, stated:

Good operational progress. EOS Energy reported continued operational progress during the June quarter, booking $257 million in new business and shipping ~$6 million in product for revenue. When we visited the company recently, we came away convinced that the company could exit 2022 with close to $500 million in backlog. Given the additional progress this quarter, our estimate for end-of-year backlog now stands at close to $600 million. **_EOS has added Bridgelink Commodities to its list of customers, with two orders totaling 1.1GWh to be delivered over the next 3 years. For context, our model shows a total of 2.4GWh in deliveries between now and the end of 2024, so the Bridgelink news is significant._** EOSE says that it has 536MWh in annualized manufacturing capacity in place currently, and we see the company exiting this year at 800MWh and next year at 1.3GWh, so the pieces are in place for EOSE to meet the demand it is generating.

43.    On October 27, 2022, the research firm EF Hutton initiated coverage of Eos because the "fully booked orders in excess of $450M" indicated the Company was a compelling investment. The report, entitled "EOSE: Giving Zinc a Think; Initiating With Buy Rating, $3.50 Price Target," stated in relevant part:

Eos Energy Enterprises is a differentiated play on energy storage (flexible intraday discharge, non-Li-ion technology, domestic supply chain/operations). While we expect near-term results to likely be impacted by pending IRA subsidies and introduction of a transformational next-generation product redesign, positioning the company for profitable deployments at scale, we like risk/reward at these levels (we would play for more binary potential on trajectory in 2024-25 vs. upcoming quarters). We also see clear catalysts for near-term stock movement, including potential finalization of DOE funding; we favor the chances currently. Strong secular trends. We view the energy storage market as a massive secular growth opportunity, noting a clear need for alternatives to Li-ion technologies. Here, Eos offers a proprietary technology focused on four-hour-plus and flexible stationary applications, with a fully recyclable, non-flammable and non-toxic solution. The company was founded 14 years ago and has been perfecting the technology since. **_Importantly this is not a science_**

19

*project, as systems are being sold and are in operation, with fully booked orders in excess of $450M.*

\* \* \*

In March 2022, Eos entered into a master supply agreement with energy developer Bridgelink, committing to delivering on a company record-breaking order of up to 500MWh (a 1.1 GWh total order) of Eos' zinc battery storage systems to be deployed at projects in Texas. In the agreement, Bridgelink Commodities (a division of Bridgelink focused on energy trading, operations, and maintenance activities) committed to purchasing 240 MWh of Eos Zynth battery storage technology with an additional option to expand to a total of 500MWh over a term of 3 years. The initial order project duration was between 3 and 8 hours, for a total value of $220 million. Bridgelink announced plans to use Eos' batteries to reduce curtailment of generated renewable energy and providing balancing and resiliency services to the Electric Reliability Council of Texas (ERCOT) grid. ***Eos was able to begin delivering on this commitment in the second quarter of fiscal 2022 given company investment in capital and domestic supply chain.***

44.     On November 7, 2022, the Company filed its Form 10-Q with the SEC for the quarter ended September 30, 2022. Therein, the Company stated in its "Company Highlights" section:

In June 2022, Bridgelink Commodities, LLC increased the Bridgelink master supply agreement to 1 GWh of energy storage systems for deliveries over the next three years with an incremental order value of $181 million for new project installations and also issued a separate 40 MWh order valued at $13 million.

45.     On the same day, November 7, 2022, the Company issued a press release titled "Eos Energy Enterprises Reports Third Quarter 2022 Financial Results." Therein, the Company, in relevant part, stated:

Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos"), a leading provider of safe, scalable, efficient, and sustainable zinc-based long duration energy storage systems, today announced financial results for the third quarter ended September 30, 2022.

**Third Quarter Financial Highlights**

- Revenue of $6.1 million, $5.3 million higher than same period last year and slightly higher sequentially; 15% increase in Energy Block units revenue recognized vs. last quarter.

- ***Current opportunity pipeline of $7.3 billion, a 5% increase quarter over quarter, with year-to-date booked orders of $324.8 million and orders backlog of $452.2 million.***

46.    On February 28, 2023, the Company filed its Form 10-K with the SEC for the year ended December 31, 2022. Therein, the Company stated in its "Company Highlights" section:

In June 2022, Bridgelink Commodities, LLC increased the Bridgelink master supply agreement to 1 GWh of energy storage systems for deliveries over the next three years with an incremental order value of $181 million for new project installations and also issued a separate 40 MWh order valued at $13 million.

47.    On the same day, February 28, 2023, the Company issued a press release titled "Eos Energy Enterprises Reports Fourth Quarter and Full Year 2022 Financial Results." Therein, the Company, in relevant part, stated:

Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos" or the "Company"), a leading provider of safe, scalable, efficient, and sustainable zinc-based long duration energy storage systems, today announced financial results for the fourth quarter and full year ended December 31, 2022.

**Full Year 2022 Highlights**

21

- Revenue of $17.9 million compared to $4.6 million in 2021, representing approximately 4x revenue growth year-over-year.

- Increased current opportunity pipeline by 83% year-over-year to $7.5 billion, which includes 4GWh in LOIs.

- Costs of Goods Sold of $153.3 million, driven by a 44% reduction in unit product cost year-over-year.

- ***Booked orders increased 2.5x to $338.6 million resulting in an orders backlog of $463.8 million as of December 31, 2022 compared to orders backlog of $147.5 million as of December 31, 2021.***

**E.      Iceberg Research Reveals That Eos's Largest Customer Was Highly Unlikely To Have The Funding To Pay Eos For Its Orders**

48.      On July 27, 2023, during market hours, Iceberg published a report titled "62% Of $Eose's Backlog Is With Financially Distressed Bridgelink Whose Renewable Energy Assets Were Foreclosed And Auctioned Off In May." Therein, Iceberg explained that Bridgelink Power had defaulted on a secured loan facility approximately two months after Bridgelink Commodities had signed the first order with Eos and was embroiled in litigation with the lender to seize its assets.  As Iceberg's report, in relevant part, explained:

> As a company with abysmal financials, the fate of EOS Energy Enterprises rests on its touted 2.2 GWh energy storage system backlog, which EOS valued at $535 million at the end of March 2023. On Twitter, those who pump the stock relentlessly use the backlog as their rallying cry.
>
> We are 100% confident that the backlog is fake. In the past, we exposed International Electric Power, LLC ("IEP"), a dubious counterparty that signed a 1 GWh contract. Ultimately, EOS had to provide financial

assistance to facilitate the IEP purchase of a significantly scaled-down order.

This unsettling practice persists till today. ***One customer, Bridgelink Commodities, accounts for half of EOS's backlog by MWh or ~62% ($331 million) of its total dollar value.*** The relationship with Bridgelink began in March 2022 with an initial order of up to 500 MWh, and later in June 2022, the contract was enlarged to 1 GWh.

We decided to dig into this customer's background and uncovered a group whose assets were recently seized by a creditor and sold in an auction.

In March 2022, its parent company Bridgelink Power ("Bridgelink") successfully closed a $200 million senior secured loan facility with private lender Crayhill Capital Management, receiving $26.3 million on the closing date.

**FILED: NEW YORK COUNTY CLERK 04/26/2023 08:08 PM**
NYSCEF DOC. NO. 4

INDEX NO. 652029/2023
RECEIVED NYSCEF: 04/26/2023

> (b)    Initial Advance.  On the Closing Date, on the terms and subject to the
> conditions of this Agreement (including the satisfaction or waiver of each of the conditions
> precedent set forth in Section 6.1 and Section 6.2), Lenders shall make an initial Advance to
> Borrower in the aggregate principal amount of Twenty-six million two hundred and sixty thousand
> nine hundred and fifty-three Dollars and eighty cents ($26,260,953.80) (the "Initial Advance"),
> which shall be funded in accordance with Section 2.4.

*Source: Senior Secured Loan Agreement and Forbearance Agreement dated 30 September 2022 –*

*(Extracted from the New York State Unified Court System website)*

After just two months, Bridgelink defaulted on the loan facility, as shown in documents filed with the New York Supreme Court in April 2023 [link omitted]. The outstanding loan balance was $40.7 million as of 20 September 2022.

> (b)    The Bridgelink Parties agree and acknowledge that:
>
> (i)    as result of the Specified Defaults and pursuant to Section 4.4(b) of
> the Existing Loan Agreement, interest on the Loan began to accrue at the Default Rate as of May
> 30, 2022; and

*Source: First Amendment to Senior Secured Loan Agreement and Forbearance Agreement dated 30 September 2022*

*(Extracted from the New York State Unified Court System website)*

Within the court filings is a letter from Crayhill to Bridgelink dated 30 September 2022. While the lender initially chose to enter into a forbearance agreement, this was quickly terminated after Crayhill discovered that Bridgelink had allowed 'multiple impermissible' claims on assets. Crayhill called this a 'blatant violation' of the loan agreement's terms.

> After entering into the Forbearance Agreement, Knights Hill obtained lien searches on the Parent, the Borrower and each ProjectCo and discovered additional Events of Default (the "Additional Events of Default") not covered by Knights Hill's July 1, 2022 and August 9, 2022 notices (the "Previous Notices") and not disclosed by the Parent or the Borrower. The lien searches revealed that the Parent, the Borrower, and several ProjectCos have granted multiple impermissible Liens on their assets in breach of the Loan Agreement, including (x) the Collateral pledged to Knights Hill under the Loan Documents and (y) the Projects. These liens, which are identified on Exhibit A hereto, are in blatant violation of Sections 9.2, 8.19(a)(xiv), and 8.19(a)(xvii) of the Loan Agreement. The violation under Section 9.2, in turn, constitutes an immediate Event of Default under Section 11.1(b) of the Loan Agreement.

*Source: Letter from Crayhill to Bridgelink dated 30 September 2022 (Extracted from the New York State Unified Court System website)*

Crayhill then seized collateral through its fund Knights Hill Ireland II DAC. Subsequently in April 2023, Crayhill advertised that Bridgelink's membership interests in various project companies were to be sold through a public auction (Pg 7).

**NOTICE OF PUBLIC SALE OF COLLATERAL**

Please take notice that (i) 100% of Bridgelink Renewable Energy Development II, LLC's membership interests in the following project companies (collectively, the "Subsidiaries"): Armadillo Solar, LLC (d/b/a Morning Glory Solar); Neal Solar, LLC; Old Hickory Solar LLC; Panther Solar, LLC; Skeeter Solar, LLC; Stark Battery, LLC; Switchgrass Solar, LLC; BT Solterra Solar, LLC; Rockefeller Solar, LLC; Cottonmouth Solar, LLC, and Bridgelink Cave Springs LLC as well as (ii) all of the assets of BT Solterra Solar, LLC, Rockefeller Solar, LLC, and Skeeter Solar, LLC will be offered for sale at a public auction under Section 9-610 of the Uniform Commercial Code as enacted in the State of New York and sold to the highest **qualified bidder** on Friday, April 28, 2023 at 10:00 a.m. (EST) at the law offices of Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY, 10020. The Subsidiaries own, operate, or conduct business related to solar power-generating and battery facilities.

This sale is held to enforce the rights of Knights Hill Ireland II DAC (the "Secured Party") under that certain Pledge Agreement, dated as of March 31, 2022 and that certain Security Agreement, dated September 30, 2022. The Secured Party reserves the right to reject all bids and terminate or adjourn the sale to another time, without further publication.

The sale will be held on an "**as is, where is**" basis, without any representations or warranties of any kind, whether express or implied. There is no warranty relating to title, possession, quiet enjoyment, or the like in this disposition. Secured Party reserves the right to credit bid at the auction and to assign its bid.

Interested parties who would like additional information regarding the collateral, the requirements to be a "qualified bidder", the terms of the sale, and/or the address for the due diligence website should contact Adil Sener or Alexander Heiman of PEI Global Partners LLC by phone at (212) 970-5100 or by email at Project_Denali_PEI@peigo.com.

*Source: April 2023 issue of Power Finance & Risk Magazine*

Bridgelink tried to prevent Crayhill from enforcing its rights by filing a lawsuit. However, despite its efforts, the auction proceeded as planned on 5 May 2023.

3.    The temporary stay of the UCC Sale provided for in the Interim Order entered by the Court on April 27, 2023 [NYSCEF.Doc. No. 13] is lifted, and Defendants may proceed with the UCC Sale scheduled at 10:00 a.m. (ET) on Friday, May 5, 2023.

4.    This Stipulation may be executed in counterparts and by PDF and/or facsimile signatures with the same force and effect as originals.

Dated: May 4, 2023
    New York, New York

Dated: May 4, 2023
    New York, New York

PRYOR CASHMAN LLP
*Attorneys for Plaintiffs*
*BridgeLink Engineering, LLC; BridgeLink*
*Renewable Energy Development II, LLC;*
*BridgeLink Renewable Energy Investments II,*
*LLC; BridgeLink Renewable Energy*
*Investments, LLC; BridgeLink Investments, LLC;*
*BridgeLink Power Holdings, LLC; Cole*
*Johnson; and Cord Johnson*

ALLEN & OVERY LLP
*Attorneys for Defendants*
*Knights Hill Ireland II DAC; Crayhill*
*Principal Strategies Fund II LP; Crayhill*
*Principal Strategies Fund US II-4 LP; and*
*Crayhill Capital Management LP*

*Source: Stipulation to lift the stay of the UCC sale (Extracted from the New York State Unified Court System website)*

Following the auction, Bridgelink tried to seal the legal documents, presumably to conceal its disastrous financial situation. The judge rejected this request.

49.     Surprisingly, the Company had not disclosed that its largest customer

was afflicted with any financial difficulties. As Iceberg pointed out:

> Nowhere has EOS disclosed this crucial information, whether through an 8-K filing, or any other means. Instead, EOS upped its Bridgelink "orders" from 500 MWh to 1 GWh in June 2022.

> We wonder how EOS can still present Bridgelink as a major client. The batteries ordered by Bridgelink were intended for renewable energy assets which have now been auctioned off. Yet, EOS continues to include Bridgelink in its backlog, and is likely to have made the same representations when applying for the Department of Energy loan.

50.     On this news, the Company's stock price fell $0.83 per share, or 23.9%,

to close at $2.65 per share on July 27, 2023, on unusually heavy trading volume.

## F.     Defendants Confirm That Bridgelink Commodities Does Not Have Financing For Its Projects With Eos

51.     On July 27, 2023, after the market closed, Eos confirmed that

Bridgelink Commodities did not have financing for the purportedly firm orders in

Eos's backlog, which is why Bridgelink Commodities was "actively seeking

financing for energy storage projects covered by Eos's multi-year Master Supply

Agreement."   The Company's press release, entitled "Eos Energy Enterprises

Provides Preliminary Results & Issues Statement Regarding Its Customer Commitments and Backlog," in relevant part, stated:

> Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos" or the "Company"), a leading provider of safe, scalable, efficient, and sustainable zinc-based energy storage systems, today announced that it expects to record revenue of $0.2 million for the quarter ended June 30, 2023, as the Company transitions manufacturing to the Eos Z3™ battery, with expected second quarter gross margin to improve by 20% to 50% over the prior quarter, cash balance (excluding restricted cash) of $23.2 million as of June 30, 2023, and booked orders of $86.9 million for the first half of 2023.

> The Company also issues the following response to statements made about its customer backlog in external reports, republished and amplified on social media, regarding two of the Company's customers:

> International Electric Power, LLC ("IEP"), who was referred to as a "dubious counterparty", has partnered with Eos since 2020 to co-develop two energy projects in Texas, with Eos providing upfront funding that was repaid when the project secured financing. The first of these projects is currently scheduled to break ground later this summer with product shipments expected in 2023.

> The report also referred to legal proceedings involving multiple Bridgelink legal entities. ***The Company believes that its customer, Bridgelink Commodities, LLC, is a separate legal entity which is not implicated in the legal matters highlighted in today's statements. This customer, representing 45% of the Company's backlog, reconfirmed today that it continues to build pipeline and is actively seeking financing for energy storage projects covered by Eos's multi-year Master Supply Agreement.***

> Eos' commercial pipeline remains strong and continues to grow in line with independent third party market forecasts. The Company believes its long-term business fundamentals are strongly supported by the secular shift occurring in the energy industry requiring long duration energy storage.

52.    The Company's assertion that the loan default and legal action against the parent company do "not implicate" Bridgelink Commodities is belied by the concession that Bridgelink Commodities was "actively seeking financing" for its orders with Eos. Notwithstanding that they are separate legal entities, the fact that a parent company going into default over $40 million makes it less likely that the subsidiary would be able to fund more than triple that amount of transactions in the near future.

53.    On this news, the Company's stock price fell $0.39 per share, or 14.7%, to close at $2.26 per share on July 28, 2023, on unusually heavy trading volume.

54.    Thereafter, on August 15, 2023, the Company held its earnings announcement for its 2023 fiscal second quarter.  Therein, Defendant Kroeker again confirmed that Bridgelink Commodities did not have financing for its projects with Eos and that they were "actively seeking *alternative financing* for these projects." As Kroeker explained:

> We were informed by Bridgelink management that its affiliate has reached a confidential settlement with its lender, and the related assets were not sold at auction.  Bridgelink recently confirmed that they are actively seeking alternative financing for these projects.

### G.    Bridgelink Power And Bridgelink Commodities Are Intertwined Entities Such That The Financial Risks To Bridgelink Power Impacted Bridgelink Commodities

55.    The operations of Bridgelink Power and its subsidiaries are intertwined and controlled by the same individuals.  Bridgelink Power's website

claims that "Bridgelink is a diversified organization that has built a strong reputation and portfolio of companies in the energy industry. We leverage our expertise and knowledge to deliver premier power infrastructure and financial performance."

56.    According to the website for one of these subsidiaries,[3] Cole Johnson leads the "Bridgelink family office" and the "The Bridgelink family office has been operating since 2012 as a successful investment organization within the renewable energy sector."[4] In fact, the subsidiary explained the Bridgelink umbrella as follows: "Bridgelink is a diversified family office that has built a strong reputation and portfolio of companies in the energy and power sectors. We leverage our expertise and knowledge to deliver premier customer experiences and financial performances." Moreover, in the section about the leadership team, the Company explained how the Bridgelink entities were all part of a unified "family office" under Mr. Johnson's control:

> Cole has nearly two decades of executive experience in the energy space and sits on multiple boards. He serves as Chairman & CEO of Bridgelink Investments and concentrates on strategic growth for all entities. During the growth process of all entities, Cole played a major role in the day-to-day growth of each asset.

> In January of 2019, Cole transitioned to focus on growing the family office and development portion of the business. The family office now holds a total of $220M of assets and company shares. This valuation is

[3] The "Executive Team" section of the Bridgelink Power website is no longer operational. https://bridgelinkpower.com/?page_id=3489

[4] https://bridgelinkinvestments.com/#our-services

expected to triple in size due to the contracts and the backlog of projects secured for 2021 and 2022. Bridgelink Investments is well-positioned to expand over the next 10 years as a leading development and investment company.

Under Cole's leadership as Chairman, he has led the development team to a pipeline backlog of over 8GW of power to come online in the next 36 months throughout the U.S. This is in addition to two major commercial land development projects and a midstream asset projected to have an estimated value of over $100M by the year 2022.

Cole has shown the oversight to lead the Bridgelink family office from a few million-dollar investments, to well on its way to having over $1B under management by 2023.[5]

57.    Details from litigation against the Bridgelink entities underscores that the significant overlap in the corporate structure. In late 2021, XL Specialty Insurance Company sued a number of related Bridgelink entities, including Bridgelink Commodities, and the individuals that run these entities, for failing to provide collateral pursuant to the indemnification agreement in late 2021. The complaint in that action demonstrates that each of these purported unique entities had the same address (777 Main Street, Fort Worth, Texas), chairman (Cole W. Johnson), and chief financial officer (Cody Bissett).[6] In fact, the Verified Complaint itself and the indemnification agreement attached thereto, stated that each of the

---

[5] https://bridgelinkinvestments.com/about-us/

[6] *See* Exhibits 1 & 2, *XL Specialty Insurance Company v. Bighorn Construction and Reclamation, LLC et al*, Case No. 1:21-cv-03068-BAH (D. Md. Dec. 1, 2021), Dkt. Nos. 1 & 1-1.

Bridgelink entities and Cole Johnson himself had agreed to be held "jointly and severally" liable as indemnitors in the transaction at issue. *Id.*[7]  That Bridgelink Commodities was financially responsible for the indemnity along with other subsidiaries of Bridgelink Power shows that the financial instability of the parent was reasonably likely to affect Eos's customer's ability to finance the contract.

58.    In fact, an arbitrator has already found that Bridgelink Power and Bridgelink Commodities were jointly and severally liable for significant costs related to the litigation risk that was revealed in the Iceberg report.  According to the arbitrator's award, Advanced Energy Capital LLC "successfully identified and introduced Bridgelink to Crayhill Capital Management ('Crayhill') and that Bridgelink has drawn tens of millions of dollars in capital funding from Crayhill."[8]  After determining that the Bridgelink entities were liable for paying a "success fee," the arbitrator had to determine which of the four named Bridgelink entities were

---

[7] In fact, in another action recently brought in the United States District Court for the Southern District of New York, a separate insurance company (Trisura Insurance Company) similarly sued a series of Bridgelink entities and Cole Johnson amongst other individuals for failing to make payments on a bond obligation in October 2022, there was another indemnification agreement of which all of these related entities and individuals indemnified each other.  *See e.g.*, *Trisura Insurance Company v. Bighorn Construction and Reclamation, LLC et al.*, No. 1:23-cv-11053-GHW-JW (S.D.N.Y. Jan. 10, 2024), Dkt. Nos. 9 (amended complaint) & 9-1 (indemnity agreement).

[8] *See* Exhibit 3, *Advanced Energy Capital LLC V. Bridgelink Commodities, LLC et al*, INDEX NO. 654442/2023 (Ny. Sup. Ct. Sept. 12, 2023), DOC. No. 3 at 2.

liable for the award.[9] The arbitrator ultimately found both Bridgelink Commodities and Bridgelink Power jointly and severally liable for the award.  As the decision explained,

> (a) Bridgelink Commodities.  The Agreement is made in the name of Bridgelink Commodities. It defines Bridgelink Commodities as "the Company" and imposes its obligations — including the obligation to pay the Success Fee — on the Company.  The Agreement is executed by Cole Johnson, who is the Chief Executive Officer of Bridgelink Commodities and is identified as "Chief Executive Officer" beneath his name on the document.  All of those facts are undisputed.  (J-1; Statement of Undisputed Facts, ¶ 3, 5)

> Above Mr. Johnson's signature on the Agreement is the entity name "Bridgelink Power" not "Bridgelink Commodities". (J-1; Statement of Undisputed Fact ¶ 5)  That discrepancy does not undermine the many facts recited above that obligate Bridgelink Commodities to perform the contractual obligation to pay the Success Fee.  Respondents do not so argue, nor do they contest that Bridgelink Commodities is bound by the Agreement.

> Accordingly, the liability of Bridgelink Commodities has been established.

> (b) Bridgelink Power. The liability of Bridgelink Power presents a closer question, because that entity is not included within the definition of "the Company" upon which the Agreement's undertakings are imposed.

> Nevertheless, the Agreement is signed "Bridgelink Power, by Cole Johnson, Title:  Chief Executive Officer". (J-1, p.  5; Statement of Undisputed Facts, ¶ 5) Cole Johnson testified at the Hearing that he

---

[9] *Id.* at 4 ("AEC asserts its claim against four Bridgelink entities:  Bridgelink Commodities, LLC; Bridgelink Power, LLC; Bridgelink Power Holdings, LLC; and Bridgelink Investments, LLC.  It seeks "to hold all of [these] Bridgelink entities . . . jointly and severally liable for the damages due to Claimant".)

signed on behalf of Bridgelink Power. (Tr. 22-23)  In the absence of any evidence to the contrary (and there has been none), this is sufficient to bind Bridgelink Power.

Therefore, the liability of Bridgelink Power has likewise been established.

Accordingly, I award the amount of $1,462,500 to Claimant Advanced Energy Capital LLC against Respondents Bridgelink Commodities, LLC and Bridgelink Power, LLC, jointly and severally.[10]

59.     As discussed in the Iceberg report, Bridgelink Power had defaulted on a secured loan facility and was embroiled in litigation with the lender to seize the parent's assets.  That lender (Crayhill) was the entity that Advanced Energy Capital LLC had introduced the Bridgelink entities to and helped to set up the financing for pursuant to its contract with Bridgelink Commodities.   As such, it is clear that Bridgelink Commodities was involved in the Bridgelink Power relationship with Crayhill.   In fact, Bridgelink Commodities was specifically found jointly and severally liable for significant costs and expenses[11] related to the financing

---

[10] *Id*. at 4-5.

Other pleadings from the litigation also confirm that Bridgelink Power and Bridgelink Commodities shared the same principal place of business, which was the same as the rest of the Bridgelink entities discussed herein.   *See* Exhibits 4 & 5 *Advanced Energy Capital LLC v. Bridgelink Commodities, LLC et al*, INDEX NO. 654442/2023 (Ny. Sup. Ct. Sept. 12, 2023) DOC. NO. 1 at ¶3; DOC. NO. 2.

[11] Advanced Energy Capital LLC was ultimately awarded $1,744,991.70 including interest, legal fees and arbitrator fees costs "jointly and severally" from both Bridgelink Commodities and Power.  *See* Exhibit 6, *Advanced Energy Capital LLC v. Bridgelink Commodities, LLC et al*, INDEX NO. 654442/2023 (Ny. Sup. Ct. Sept. 12, 2023), Doc. No. 4 at 1-2.

transaction that Bridgelink Power defaulted on, resulting in the litigation over its assets.

60.    Moreover, in the lawsuit against Bridgelink Power referenced in the Iceberg report, the plaintiffs in that case which included, Cole Johnson and a half a dozen Bridgelink entities, including Bridgelink Power, admitted that the lawsuit could destroy the entire Bridgelink renewable energy business.  As they explained, "Plaintiffs' renewable energy business, worth in excess of $350 million, will be destroyed in the absence of this Court's grant of a temporary restraining order ("TRO") and preliminary injunction enjoining the sale of Plaintiffs' business through Defendants' UCC sale scheduled for 10:00AM Friday, April 28, 2023."[12] They even further explained that: "If the Public Auction is permitted to proceed, it will destroy Plaintiffs' business, irreparably damage Plaintiffs' reputation and good will, and render ineffectual any future judgment in this action in favor of Plaintiffs, as Plaintiffs' rights and interests in their valuable assets will have long been extinguished through the Public Auction."[13]  As Cole Johnson further explained:

---

[12] *See* Exhibit 7, *Bridgelink Engineering, LLC, et al. v. Knights Hill Ireland II DAC, et al.*, INDEX NO. 652029/2023 (Ny. Sup. Ct. Apr. 26, 2023), Doc. No. 10 at 1.

[13] *Id*. at 2.  Additionally, in the same brief, the plaintiffs admitted that they lacked sufficient financing for its projects. *Id.* at 8 ("Moreover, Defendants have continuously impeded Plaintiffs' attempts to secure alternative project financing, and have effectively scuttled several transactions proposed by Plaintiffs through their actions and inactions."

Defendants now stand on the verge of completing their predatory scheme, having scheduled the Public Auction of Plaintiffs' valuable assets for Friday, April 28, 2023 at their lawyers' New York offices. However, the collateral is comprised of 100% of the limited liability interests in Plaintiffs' various LLCs which own PV solar projects and Battery Energy Storage Systems projects. The value of these assets is outlined in an independent Kroll valuation report as of December 31, 2022, which concluded that the mid-value "as is" of all the projects in total exceeds $352 million. It is important to note, however, that the value of these solar development projects, for which construction has not yet begun, is dependent on the vertically integrated Plaintiffs' team's ability to develop these projects to achieve Notice to Proceed. Permitting the Public Auction to move forward will assure incalculable, immeasurable and irreparable harm.[14]

61.    The foregoing legal filings and facts show that Bridgelink Power's financial condition significantly impacted Bridgelink Commodities. For example, if Bridgelink Power were unable to pay its legal judgments, Bridgelink Commodities would be responsible for a material amount since the entities were jointly and severally liable. Moreover, Cole Johnson was empowered to bind both Bridgelink Power and Bridgelink Commodities to contracts. Thus, Defendants would have been able to learn of any financial difficulties Bridgelink Commodities (or any Bridgelink entity) faced from Mr. Johnson, including as a result of any troubles impacting its parent company, to assess Eos's ability to realize its backlog of contracts.

---

[14] *See* Exhibit 8, *Bridgelink Engineering, LLC, et al. v. Knights Hill Ireland II DAC, et al.*, INDEX NO. 652029/2023 (Ny. Sup. Ct. Apr. 26, 2023), Doc. No. 3 at ¶13.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

62.    On May 9, 2023, the Company issued a press release titled "Eos Energy Enterprises Reports First Quarter 2023 Financial Results." Therein, the Company, in relevant part, stated:

> Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos" or the "Company"), a leading provider of safe, scalable, efficient, and sustainable zinc-based long duration energy storage systems, today announced financial results for the first quarter ended March 31, 2023.
>
> **First Quarter Financial Highlights**
>
> - $8.8 million revenue, compared to $3.3 million in 1Q 2022, a 168% increase year-over-year.
>
> - Cost of Goods Sold of $26.9 million, a decrease of 24% compared to 1Q 2022, representing a 25% reduction in product unit cost year-over-year.
>
> - Operating expenses of $19.4 million remained flat year-over-year.
>
> - $16.1 million cash balance on March 31, 2023, compared to $17.1 million on December 31, 2022.
>
> - Booked $86.3 million in orders, ***resulting in an order backlog of $535.1 million as of March 31, 2023,*** an increase of more than 2.5x versus 1Q 2022.

63.    On May 10, 2023, the Company held an earnings call to discuss Eos's 2023 fiscal first quarter results.  Therein, Defendant Mastrangelo, in relevant part, stated:

Moving on to Page 4 on the operating highlights. You continue to see good progress. Commercially, I'll go through some more details on the pipeline in a future slide, but we continue to see the opportunity pipeline increase. We booked a large order for $87 million, nearly $87 million, and that **brought our backlog up to $535 million with -- representing 2.2 gigawatt hours of power**.

\* \* \*

When you look at our current pipeline, current pipeline is up in Q2, and we signed over $500 million of LOIs. Now think again about how we think about the movement through our pipeline. We don't call it current pipeline unless we have a technical use case where we can provide a technical proposal to the customer, which then leads us to giving them a nonbinding financial quote, which that stands at $6 billion in and of itself. Our goal with that combined $7 billion is to then get customers to sign an LOI with us. So we get on the same side of the table with them and close the project out to allow them to generate revenue and allow us to put product out in the field. That stands now at $1.5 billion with 7 gigawatt hours of potential.

**We work through those. And when you think about the timing of LOI to firm commitment, you're working through various different aspects on commercial terms, permitting, land rights and interconnections to be able to get to a firm commitment that then goes into our backlog, which, as I stated earlier, stands at $535 million, up $71 million versus fourth quarter.**

64.     The above statements in the preceding two paragraphs were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Bridgelink Power, the parent company of Eos' largest customer, Bridgelink Commodities, defaulted on a secured loan facility and was embroiled in litigation with the lender to seize the parent's assets; (2) that the

foregoing threatened Bridgelink Commodities' commitment and ability to purchase Eos products; (3) that, as a result, there was a material risk to Eos's backlog; and (4) that, as such, there was a material undisclosed risk to Eos's business, operations, and prospects.

## VI.    LOSS CAUSATION

65.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Eos's stock price throughout the Class Period until the truth regarding Eos's order backlog was disclosed.

66.    On July 27, 2023, during market hours, Iceberg published a report that revealed that Bridgelink Commodities, Eos's largest customer, was unlikely to fund its orders and that, as a result, the Eos's backlog "is fake."

67.    On this news, the Company's stock price fell $0.83 per share, or 23.9%, to close at $2.65 per share on July 27, 2023, on unusually heavy trading volume.

68.    On July 27, 2023, after the market closed, Eos admitted that Bridgelink Commodities did not have funding for its Eos orders and was "actively seeking financing for energy storage projects covered by Eos's multi-year Master Supply Agreement."

69.     On this news, the Company's stock price fell $0.39 per share, or 14.7%, to close at $2.26 per share on July 28, 2023, on unusually heavy trading volume.

70.     During the Class Period, Plaintiff and the Class purchased Eos's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII.  CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Eos securities between May 9, 2023 and July 27, 2023, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

72.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Eos's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes

that there are at least hundreds or thousands of members in the proposed Class. Millions of Eos shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Eos or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

73.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

74.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

75.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Eos; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

76.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII.  UNDISCLOSED ADVERSE FACTS

77.    The market for Eos's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Eos's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Eos's securities relying upon the integrity of the market price of the Company's securities and market information relating to Eos, and have been damaged thereby.

78.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Eos's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The

statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Eos's business, operations, and prospects as alleged herein.

79.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Eos's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

80.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements

or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Eos, their control over, and/or receipt and/or modification of Eos's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Eos, participated in the fraudulent scheme alleged herein.

81.    Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Eos, including each high-ranking officer or director, is imputable to Eos. The knowledge of each of these individuals should therefore be imputed to the Company for the purposes of assessing corporate scienter.

82.    Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Eos as an entity. Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the

statements alleged were made to the investing public regarding the Company's order backlog and largest customer—important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to the investor.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

83.    The market for Eos's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Eos's securities traded at artificially inflated prices during the Class Period. On June 28, 2023, the Company's share price closed at a Class Period high of $5.03 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Eos's securities and market information relating to Eos, and have been damaged thereby.

84.    During the Class Period, the artificial inflation of Eos's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Eos's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Eos and its business, operations,

and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

85. At all relevant times, the market for Eos's securities was an efficient market for the following reasons, among others:

(a) Eos shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Eos filed periodic public reports with the SEC and/or the NASDAQ;

(c) Eos regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Eos was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to

the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

86.    As a result of the foregoing, the market for Eos's securities promptly digested current information regarding Eos from all publicly available sources and reflected such information in Eos's share price. Under these circumstances, all purchasers of Eos's securities during the Class Period suffered similar injury through their purchase of Eos's securities at artificially inflated prices and a presumption of reliance applies.

87.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.  NO SAFE HARBOR

88.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Eos who knew that the statement was false when made.

## XII.  CLAIMS FOR RELIEF

### FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

89.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

90.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Eos's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

91.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Eos's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

48

92.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Eos's financial well-being and prospects, as specified herein.

93.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Eos's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Eos and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

94.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer

49

and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

95.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Eos's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately

refraining from taking those steps necessary to discover whether those statements were false or misleading.

96.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Eos's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Eos's securities during the Class Period at artificially high prices and were damaged thereby.

97.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Eos was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Eos securities, or, if they had acquired such

securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

98.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

99.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

100.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

101.    Individual Defendants acted as controlling persons of Eos within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which

Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

102.  In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

103.  As set forth above, Eos and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 5, 2024              By:   _s/ James E. Cecchi_____

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiff and the Class*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Casey E. Sadler
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Lead Counsel for Lead Plaintiff and the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*