**CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM HOUCK, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EOS ENERGY ENTERPRISES, INC., JOSEPH MASTRANGELO, and NATHAN KROEKER,<br><br>Defendants. | Case No. 2:23-cv-04113-JKS-MAH<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................... 1

II.    STATEMENT OF FACTS ....................................................................... 4

    A.    Eos Successfully Focuses The Market Towards Its Backlog ................................ 4

    B.    The Company Announces Its Largest Order Ever: $181 Million Contract With Bridgelink Commodities .................................................................... 5

    C.    Eos Confirms Suspicions That Bridgelink Commodities Does Not Have Financing For Its Projects With Eos ................................................... 6

    D.    Bridgelink Power And Bridgelink Commodities Are Intertwined Entities Such That The Financial Risks To Bridgelink Power Impacted Bridgelink Commodities ..... 7

III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION ........... 9

IV.    ARGUMENT. ........................................................................................ 10

    A.    Defendants' Misrepresentations Are Actionable ................................................. 10

        1.    Legal Standard ...................................................................... 10

        2.    Notwithstanding "Accurate" Backlog Figures, Defendants Had A Duty To Disclose The Risk Of Nonpayment ........................................... 11

        3.    Defendants Created A Misleading Impression About The Strength Of The Company's Business .................................................................. 13

    B.    The Complaint Raises A Strong Inference Of Scienter ....................................... 16

        1.    Legal Standards...................................................................... 16

        2.    Defendants Knew Or Recklessly Disregarded Critical Facts Undermining Their Public Statements ......................................................... 17

        3.    The Company's Booked Orders Were A Core Operation Of The Company .............................................................................. 20

        4.    Defendants Fail To Present A More Compelling Inference ..................... 21

    C.    The Complaint Adequately Alleges Loss Causation .......................................... 22

i

D.  Plaintiff Adequately Alleges Control Person Liability ........................................ 26

V.  CONCLUSION ................................................................................................................... 26

## TABLE OF AUTHORITIES

<u>CASES</u>

*Abbott Labs. v. Johnson & Johnson, Inc.*,
  524 F. Supp. 2d 553 (D. Del. 2007) ....................................................................... 27

*Allegheny Cnty. Emps' Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021) ................................................................. 19, 20

*Altayyar v. Etsy, Inc.*,
  242 F. Supp. 3d 161 (E.D.N.Y. 2017) ..................................................................... 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................... 9, 19

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................ 11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................................... 9, 10

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ................................................................................... 13

*Bishins v. CleanSpark, Inc.*,
  2023 WL 112558 (S.D.N.Y. 2023) .......................................................................... 24

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) ............................................................................... 12

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) .................................................................................... 10

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) ...................................................................... 11

*De Vito v. Liquid Holdings Grp., Inc.*,
  2018 WL 6891832 (D.N.J. Dec. 31, 2018) ......................................................... *passim*

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) .......................................................................................... 23, 24

*EP Medsystems, Inc. v. EchoCath, Inc.*,
  235 F.3d 865 (3rd Cir. 2000) ................................................................................... 23

iii

*Fergus v. Immunomedics, Inc.*,
   2020 WL 2832565 (D.N.J. June 1, 2020) ................................................................. 10

*Hall v. Johnson & Johnson*,
   2019 WL 7207491 (D.N.J. Dec. 27, 2019) ............................................................... 13

*Hall v. The Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008) ...................................................................... 11

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F.3d 267 (3d Cir. 2004) ..................................................................................... 11

*In re Allergan Generic Drug Pricing Sec. Litig.*,
   2019 WL 3562134 (D.N.J. Aug. 6, 2019) ................................................................. 21

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...................................................................... 14

*In re Bear Stearns Cos., Inc. Sec., & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011) ...................................................................... 25

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) ............................................................... 17, 19, 20

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
   2020 WL 1329354 (S.D.N.Y. 2020) ......................................................................... 24

*In re Enzymotec Sec. Litig.*,
   2015 WL 8784065 (D.N.J. Dec. 15, 2015) .............................................................. 9, 21

*In re Eros Int'l PLC Sec. Litig.*,
   2021 WL 1560728 (D.N.J. Apr. 20, 2021) ................................................................ 23

*In re Express Scripts Holding Co. Sec. Litig.*,
   2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ............................................................ 16

*In re Galena Biopharma, Inc. Sec. Litig.*,
   2019 WL 5957859 (D.N.J. Nov. 12, 2019) .............................................................. 23

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012) ...................................................................... 18

*In re Majesco Sec. Litig.*,
   2006 WL 2846281 (D.N.J. Sept. 29, 2006) ........................................................ 16, 21

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
   2011 WL 3444199 (D.N.J. Aug. 8, 2011) ........................................................ 10, 16

*In re Mylan N.V. Sec. Litig.*,
   2023 WL 3539371 (W.D. Pa. May 18, 2023).......................................................... 20

*In re Rent-Way Sec. Litig.*,
   209 F. Supp. 2d 493 (W.D. Pa. 2002)..................................................................... 21

*In re Romeo Power Inc. Sec. Litig.*,
   2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022) ........................................................ 15

*In re Urban Outfitters, Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) ................................................. 20, 22, 25, 26

*In re Vivendi Universal, S.A. Sec. Litig.*,
   634 F. Supp. 2d 352 (S.D.N.Y. 2009)..................................................................... 22

*In re Wilmington Trust Sec. Litig.*,
   29 F. Supp. 3d 432 (D. Del. 2014).................................................................... 22, 26

*In re Winstar Commc'ns*,
   2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)...................................................... 24, 25

*In re WorldCom, Inc. Sec. Litig.*,
   346 F. Supp. 2d 628 (S.D.N.Y. 2004)..................................................................... 24

*Inst. Inv. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)............................................................... 16, 17, 19, 20

*Joffee v. Lehman Bros., Inc.*,
   410 F. Supp. 2d 187 (S.D.N.Y.)............................................................................. 25

*Junker v. Med. Components, Inc.*,
   2015 WL 12806501 (E.D. Pa. May 20, 2015) ........................................................ 26

*Laasko v. Endo Int'l, plc*,
   2022 WL 3444038 (D.N.J. Aug. 17, 2022) ............................................................ 16

*Langford v. City of Atl. City*,
   235 F.3d 845 (3d Cir. 2000)................................................................................... 10

*Liberty Ridge LLC v. RealTech Sys. Corp.*,
   173 F. Supp. 2d 129 (S.D.N.Y. 2001)..................................................................... 21

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC,
   797 F.3d 160 (2d Cir. 2015)..................................................................... 27

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)............................................................................... 9, 10

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) ..................................................... 20, 23

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001).................................................................... 23

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).................................................................... 19

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008).................................................................. 4, 9

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
   185 F. Supp. 2d 389 (S.D.N.Y. 2002)...................................................... 24

*Roofer's Pension Fund v. Papa*,
   2018 WL 3601229 (D.N.J. July 27, 2018).......................................... 11, 21

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992).................................................................... 11

*Singh v. Schikan*,
   106 F. Supp. 3d 439 (S.D.N.Y. 2015)...................................................... 13

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
   545 F. Supp. 3d 120 (S.D.N.Y. 2021)...................................................... 24

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
   499 F. Supp. 3d 49 (D. Del. 2020).......................................................... 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)........................................................................ 9, 17, 22

*W. Palm Beach Police Pension Fund v. DFC Global Corp.*,
   2015 WL 3755218 (E.D. Pa. June 16, 2015) ...................................... 25, 26

*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017).............................................................. 10, 16

*Yannes v. SCWorx Corp.*,
  2021 WL 2555437 (S.D.N.Y. June 21, 2021) ...................................................................... 13, 21

STATUTES

15 U.S.C. § 78t(a) ...................................................................................................................... 26

15 U.S.C. § 78u-4(b) ................................................................................................................... 9

RULES

Fed. R. Civ. P. 9(b) ..................................................................................................................... 9

Fed. R. Civ. P. 15 ...................................................................................................................... 27

Fed. R. Civ. P. 15(a)(2) ............................................................................................................. 26

Lead Plaintiff William Houck ("Plaintiff") respectfully submits this opposition to Defendants' motion to dismiss (ECF 26) the Second Class Action Complaint for Violations of the Federal Securities Laws (ECF 25, the "Complaint").[1]

## I.    **INTRODUCTION**

As a fledging battery company that was not actually profitable, Eos touted its backlog of booked orders to the market as being indicative of the Company's future prospects, which enabled Eos to raise funds and increase stock value.  In fact, since it became a publicly traded company in late 2020, Eos announced its newly booked orders and its order backlog in its quarterly financial highlights, the Company's executives routinely talked about order backlog in earnings calls (often before any other financial information about the Company), and analysts asked specific questions about it (which executives answered).  Defendants' strategy was successful: analysts that followed the Company focused on backlog as indicative of Eos's growth prospects and success.

In March 2022, the Company announced the largest deal in the history of the Company: a $150 million deal, which represented nearly 75% of Eos's backlog at the time, with Bridgelink Commodities, LLC ("Bridgelink Commodities").  Just months later, on July 6, 2022, Eos announced another deal with Bridgelink Commodities that increased its order value to $181 million.  Analysts began to take notice of these deals and believed the Company was moving in the right direction.  Thereafter, the Company repeatedly touted both in its SEC filings and press releases its backlog figures, which was largely propped by the deals with Bridgelink Commodities.

---

[1] Defendants are Eos Energy Enterprises, Inc. ("Eos" or the "Company"), Joseph Mastrangelo, and Nathan Kroeker (collectively, "Defendants"). The brief filed by Defendants (ECF 26-1) is cited as "Def. Br." and Defendants' exhibits attached to the Declaration of Matthew T. Martens (ECF 26-2) are cited as "Def. Ex." All "¶__" citations are to the Complaint. All emphasis is added, and all internal citations and quotation marks are omitted, unless otherwise stated.

Unbeknownst to investors, however, Bridgelink Commodities did not have financing for the purportedly firm orders in Eos's backlog. Bridgelink Commodities was dependent on entities controlled by the parent company Bridgelink Power ("Bridgelink Power"), which traced their ownership to one individual. Bridgelink Power and certain of its related entities defaulted on a large, secured loan facility, in response to which the lender sought to seize the collateral, *i.e.*, the parent company's assets. In the ensuing litigation, Bridgelink Power admitted that the seizure would "destroy" its entire renewable energy business, which naturally includes Bridgelink Commodities. As such, there would have been no purpose for Bridgelink Commodities to complete its purported purchases of batteries from Eos. The Company has confirmed that Bridgelink Commodities did not have financing for the purportedly firm orders in Eos's backlog.

Thus, there was a material undisclosed risk leading to the misleading impression that the Company's prospects were different (and better) than they appeared. Defendants failed to disclose to investors "that Bridgelink Power, the parent company of Eos's largest customer, Bridgelink Commodities, defaulted on a secured loan facility and was embroiled in litigation with the lender to seize the parent's assets" and "that, as a result, Bridgelink Commodities' commitment and ability to purchase Eos products was not as secure as Eos had led investors to believe." ¶64. And when this information was disclosed to the market, the Company's stock greatly declined.

Defendants do not dispute that this was the case. In fact, they have abandoned prior arguments – that the loan issues and litigation (and thus the corresponding risk to the backlog) had occurred at the time of the false statements and that the issues with the parent impacted Eos's customer – in light of Plaintiff's amendment. *Compare* Def. Br. at 3 with ECF 19-1 at 3. Defendants' abandonment of these arguments is a concession that the Complaint sufficiently demonstrates that the parent's financial difficulties were knowable to Defendants during the Class

2

Period and that those troubles impacted Bridgelink Commodities' ability to pay Eos. The two entities were so intertwined that the legal issues impacting Bridgelink Power necessarily impacted and put at risk Bridgelink Commodities.

Defendants' core challenge to the well-pled allegations is that Bridgelink Commodities has not repudiated or failed to honor its contracts *yet*. *See, e.g.*, Def. Br. at 3-4.  Far from a death knell, Defendants' argument is that the undisclosed risk has not materialized, which is unavailing for two reasons. First, Defendants had a duty to disclose the risk (regardless of whether it had materialized) because it was material: the likelihood that the largest deal in the Company's backlog would convert to actual revenue would have altered the total mix of information. Second, Defendants admit that Bridgelink Commodities is "actively seeking financing" for its contract with Eos, demonstrating its inability to pay the Company. Indeed, the 3-year, $181 million contract was announced nearly two years ago, but Bridgelink Commodities does not appear to have not honored its orders to date.[2]

Defendants feign ignorance, but they ignore that the Individual Defendants told the investing public that they engaged in monthly assessments of the "health" of its backlog, which includes evaluating "that a project that was booked in the past is unlikely to materialize" and "remov[ing] [them] from our backlog."  ¶24.  This assessment would not have been particularly difficult because the Company only had 13 customers, of which only 12 had been shipped products. ¶25.  Such an assessment necessarily would have uncovered that Eos's largest customer was in dire financial straits.  Given prior accusations that Eos padded its backlog, Defendants were

---

[2] Eos has reported $34.3 million in revenue for fiscal 2021 and 2022 combined, and the Company reported a paltry $16.4 million revenue for fiscal 2023. *See* https://investors.eose.com/news-releases/news-release-details/eos-energy-enterprises-reports-fourth-quarter-full-year-2023.

on notice that analysts were looking into the veracity of their backlog figures and should have paid close attention to the reported figures (or were reckless in failing to do so).

When the Complaint is viewed as true, as it must, it states a claim for relief plausible on its face. As the Third Circuit has explained, stating a claim "does not impose a probability requirement at the pleading stage," but "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). The Complaint satisfies these pleading requirements, and Defendants' Motion should be denied.

## II.    STATEMENT OF FACTS

Eos designs, develops, manufactures, and markets zinc-based energy storage solutions for utility-scale, microgrid, and commercial and industrial applications. ¶21. Founded in 2008, Eos became a public entity through a business combination with a special purpose acquisition company called B. Riley Principal Merger Corp. II in November 2020. ¶22.

### A.    Eos Successfully Focuses The Market Towards Its Backlog

Both before and after it went public, the Company touted its booked orders to the market, announcing newly booked orders, highlighting booked orders and order backlog in its quarterly financial reports, and focusing on order backlog in earnings calls. ¶23. Because Eos had not been profitable historically, this focus on booked orders (or backlog) signaled the purported strength of the Company's business was used by Defendants to raise funds. ¶24. For example, before the Class Period, the Company would tout its booked order backlog as "highlights" for the business. ¶32 ("First Quarter Highlights" – "Continued commercial pipeline growth; booked orders of $67 million year-to-date resulting in orders backlog of $212 million with a current opportunity pipeline of over $6 billion"); ¶40 ("Second Quarter Highlights" – "Orders backlog more than doubled in the quarter to $457.3 million"); ¶45 ("Third Quarter Financial Highlights" –  Current opportunity

4

pipeline of $7.3 billion, a 5% increase quarter over quarter, with year-to-date booked orders of $324.8 million and orders backlog of $452.2 million"); ¶47 ("Full Year 2022 Highlights" – "Booked orders increased 2.5x to $338.6 million resulting in an orders backlog of $463.8 million as of December 31, 2022 compared to orders backlog of $147.5 million as of December 31, 2021").

Indicating the market's interest in the Company's backlog, analysts would ask questions about it on earnings calls, and analyst reports would focus on it being a positive indicator of the Company's prospects. ¶¶23, 33, 34 ("emerge from this year with ~$500 million in backlog — which we view as a testament to the viability of the company's technology"); ¶36 (Evercore ISI, issued analyst report that focused on backlog, entitled "Backlog More Than Doubles; Momentum Accelerating"); ¶37 (Seaport Research Partners issued an analyst report that focused on the Company's backlog, entitled "EOSE wins Bridgelink MSA expansion that more than doubles backlog, appears at another politically-positive event -- both bullish"); ¶41 (Evercore ISI explaining that Eos was a "compelling investment" because of its "strong backlog growth" and "backlog surging"; ¶43 (research firm EF Hutton initiated coverage of Eos because the "fully booked orders in excess of $450M" indicated the Company was a compelling investment).

**B.    The Company Announces Its Largest Order Ever: $181 Million Contract With Bridgelink Commodities**

Against this backdrop, Eos announced the largest deal in the history of the Company. On March 9, 2022, the Company announced a deal with Bridgelink Commodities representing a total order value of up to $150 million, or nearly 75% of Eos's backlog. ¶30. As the Company explained:

> Bridgelink has committed to purchase 240 MWh of energy storage capacity provided by Eos's Znyth™ zinc-based technology, accompanied by an option to purchase long-term maintenance support, with an additional option to expand to a total of 500 MWh over a term of 3 years, representing a total order value of up to $150 million.

5

\*    \*    \*

"*With this partnership, our backlog grows to more than $200 million and is rapidly approaching 1 GWh.* We continue to make real progress towards our $400 million booked order target for 2022 with a commercial opportunity pipeline of more than $4 billion," said Balki Iyer, Chief Commercial Officer of Eos.

¶30.  Thereafter, on July 6, 2022, Eos announced another deal with Bridgelink Commodities that increased its order value to $181 million. ¶35.

### C.    Eos Confirms Suspicions That Bridgelink Commodities Does Not Have Financing For Its Projects With Eos

On July 27, 2023, during market hours, Iceberg Research issued a report revealing that Bridgelink Power, the parent of Eos's largest customer, had defaulted on a secured loan facility and was embroiled in litigation with its lender to seize its assets, including the projects subject to Eos's contract with Bridgelink Commodities.  ¶¶48-49.  This raised suspicions that Bridgelink Commodities would not pay Eos and that the $181 million contract would not be realized. On this news, the Company's stock price fell $0.83 per share, or 23.9%, to close at $2.65 per share on July 27, 2023, on unusually heavy trading volume.  ¶50.

On July 27, 2023, after the market closed, Eos confirmed these suspicions, stating that Bridgelink Commodities was "actively seeking financing for energy storage projects covered by Eos's multi-year Master Supply Agreement."  ¶51.  Although Bridgelink Commodities "is not implicated in the legal matters highlighted in" Iceberg's report, the Company admitted that "[t]his customer, representing 45% of the Company's backlog, . . . is actively seeking financing for energy storage projects covered by Eos's multi-year Master Supply Agreement."  *Id.* Despite Eos's attempts to distance its customer from its parent's failings, the market understood that a parent company defaulting over $40 million makes it less likely that the subsidiary could fund more than triple that amount of transactions in the near future.  ¶52.  As such, the Company's stock price fell

6

$0.39 per share, or 14.7%, to close at $2.26 per share on July 28, 2023, on unusually heavy trading volume.  ¶53.

Thereafter, on August 15, 2023, Defendant Kroeker reiterated that Bridgelink Commodities did not have financing for its projects with Eos.  ¶54.  Additionally, during the same earnings call, Defendant Kroeker explained that the Company had a routine, detailed process for assessing whether orders on their backlog would likely to be completed.  ¶24.  As he explained:

> Each quarter, we assess the health of our reported backlog.  Doing so requires us to exercise judgment about uncertain factors.  We sometimes come to the view that a project that was booked in the past is unlikely to materialize or a change order has been executed, in which case, we may adjust our backlog.  This assessment has resulted in projects being removed from our backlog in each of the last 2 quarters.

¶24.  The entire backlog only had 13 customers, and only 12 customers had ever received Eos's products.  ¶25.

**D.    Bridgelink Power And Bridgelink Commodities Are Intertwined Entities Such That The Financial Risks To Bridgelink Power Impacted Bridgelink Commodities**

The operations of Bridgelink Power and its subsidiaries are intertwined and controlled by the same individuals.  Specifically, Cole Johnson leads the "Bridgelink family office" and the "The Bridgelink family office has been operating since 2012 as a successful investment organization within the renewable energy sector."  ¶56.  The Bridgelink umbrella is "a diversified family office that has built a strong reputation and portfolio of companies in the energy and power sectors."  ¶55.  The company explained that the Bridgelink entities are all part of a unified "family office" under Mr. Johnson's control.  *Id.*

Additionally, details from litigation against the Bridgelink entities underscores the significant overlap in the corporate structure. In late 2021, XL Specialty Insurance Company sued a number of related Bridgelink entities, including Bridgelink Commodities, and the individuals that run these entities for failing to provide collateral pursuant to the indemnification agreement.

7

¶57.   The complaint in that action demonstrates that each of these purported unique entities had the same address, chairman (Cole W. Johnson), and chief financial officer (Cody Bissett). *Id.* The indemnification agreement attached thereto stated that each of the Bridgelink entities and Cole Johnson himself had agreed to be held "jointly and severally" liable. *Id.* That Bridgelink Commodities was financially responsible for the indemnity shows that the financial instability of the parent was reasonably likely to affect Eos's customer's ability to finance the contract.

Likewise, an arbitrator has already found that Bridgelink Power and Bridgelink Commodities were jointly and severally liable for significant costs related to the litigation risk that was revealed in the Iceberg report.  ¶58.   According to the arbitrator's award, Advanced Energy Capital LLC "successfully identified and introduced Bridgelink to Crayhill Capital Management ('Crayhill') and that Bridgelink has drawn tens of millions of dollars in capital funding from Crayhill."  *Id.* Crayhill is the lender that was attempting to seize Bridgelink Power's assets, according to the Iceberg report.  As such, it is clear that Bridgelink Commodities would be affected by the financial dispute between Bridgelink Power and Crayhill.  Indeed, Bridgelink Commodities was jointly and severally liable for significant costs and expenses related to the credit facility that that Bridgelink Power defaulted on.  ¶59. In the lawsuit with Crayhill, the Bridgelink entities (including Bridgelink Power), admitted that the lawsuit could destroy the entire Bridgelink renewable energy business. ¶60.  They also admitted that they lacked sufficient financing for their projects, *i.e.,* including those affected by the contract with Eos.  ¶60 at n.13.

The foregoing legal filings and facts demonstrate that Bridgelink Power's financial condition significantly impacted Bridgelink Commodities. ¶61. For example, if Bridgelink Power were unable to pay its legal judgments, Bridgelink Commodities would be responsible for a material amount since the entities were jointly and severally liable. ¶61. Moreover, Cole Johnson

8

was empowered to bind both Bridgelink Power and Bridgelink Commodities to contracts. Thus, Defendants would have been able to learn of any financial difficulties Bridgelink Commodities (or any Bridgelink entity) faced from Mr. Johnson, including as a result of any troubles impacting its parent company, to assess Eos's ability to realize its backlog of contracts. ¶61

## III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

To state a claim for securities fraud under §10(b) of the Exchange Act a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[3] These claims are subject to the pleading standards of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b), requiring allegations of fraud to be stated with particularity. 15 U.S.C. § 78u-4(b). The PSLRA does not require a plaintiff to plead *evidence* of claims, however; on a motion to dismiss, courts must accept all facts alleged as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

As such, a complaint should not be dismissed if it contains sufficient factual matter that, if accepted as true, states a claim for relief plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Even under *Twombly*, stating a claim "does not impose a probability requirement at the pleading stage," but "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).[4]

---

3 Defendants do not challenge, and thus concede, that Plaintiff has adequately alleged the third, fourth and fifth factors delineated in *Matrixx* (*i.e.*, purchase/connection, reliance, and economic loss). As such, Plaintiff only addresses the elements of falsity, scienter, and loss causation herein.

4 *See also In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *6 (D.N.J. Dec. 15, 2015) (following

9

In sum, the issue on Defendants' Motion is not "whether the plaintiffs will ultimately prevail" but "whether they are entitled to offer evidence to support their claims." *Langford v. City of Atl. City*, 235 F.3d 845, 847 (3d Cir. 2000). The Complaint satisfies these pleading requirements, and Defendants' Motion should be denied.

## IV.    ARGUMENT.

### A.    Defendants' Misrepresentations Are Actionable

#### 1.    Legal Standard

Under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). The alleged false and misleading statements must be evaluated in the context they would have been understood by a reasonable investor. *Matrixx*, 563 U.S. at 44 (2011). Literally accurate statements "can become through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers." *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011). Thus, although §10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information, disclosure is required when necessary to make statements made, in the light of the circumstances in which they were made, not misleading." *Fergus v. Immunomedics, Inc.*, 2020 WL 2832565, at *3 (D.N.J. June 1, 2020); *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) ("[O]nce a company has chosen to speak on an issue--even an issue it had no independent obligation to address--it cannot omit

---

*Twombly* and *Iqbal*, courts should "assume the[] veracity [of well-pleaded factual allegations] and then determine whether they plausibly give rise to an entitlement for relief.").

10

material facts related to that issue so as to make the disclosure misleading.").

A misstatement or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992). Thus, "[o]nly if the alleged misrepresentations or omissions are so ***obviously unimportant*** to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Id.* Materiality is thus not suitable for disposition on a motion to dismiss. *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275-76 (3d Cir. 2004).

### 2. Notwithstanding "Accurate" Backlog Figures, Defendants Had A Duty To Disclose The Risk Of Nonpayment

Because Eos had historically been unprofitable and used the backlog to tout the strength of its business, Defendants had a duty to disclose that there was a material risk inhibiting Eos's ability to convert nearly 75% of its backlog into actual revenue. *See* Sec. II.A-B, *supra*; *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 366-67 (S.D.N.Y. 2012) (omission of performance issues painted "false financial picture" of company's backlog).

Defendants claim that they are not required to do more than disclose accurate backlog figures. Def. Br. at 22. Even accurate statements are actionable for omitting then-present problems. *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *13 (D.N.J. July 27, 2018) (accurate statements of past performance actionable for omitting that company "was experiencing difficulty maintaining those growth rates"); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp.

11

2d 212, 230 (S.D.N.Y. 2008) (statements that company "can grow up to 1,800 stores" with Disney were actionable in light of undisclosed, present problems with Disney).[5] The accuracy of Eos's reported backlog is called into question by the insolvency of the Company's largest customer.

Their disclosure obligations arise from Defendants' self-proclaimed intimate knowledge of Eos's backlog. *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *29 (D.N.J. Dec. 31, 2018) ("[B]y speaking on the subject, [Eos] took on a duty to ensure that its disclosures were not misleading."). For example, in one of the two false statements at issue, Defendant Mastrangelo, explained in great detail how items get into Eos's "current pipeline," including discussing the negotiations "on the same side of the table with them":

> We booked a large order for $87 million, nearly $87 million, and that ***brought our backlog up to $535 million with – representing 2.2 gigawatt hours of power***.
>
> *    *    *
>
> When you look at our current pipeline, current pipeline is up in Q2, and we signed over $500 million of LOIs. Now think again about how we think about the movement through our pipeline. We don't call it current pipeline unless we have a technical use case where we can provide a technical proposal to the customer, which then leads us to giving them a nonbinding financial quote, which that stands at $6 billion in and of itself. Our goal with that combined $7 billion is to then get customers to sign an LOI with us. So we get on the same side of the table with them and close the project out to allow them to generate revenue and allow us to put product out in the field. That stands now at $1.5 billion with 7 gigawatt hours of potential.
>
> ***We work through those. And when you think about the timing of LOI to firm commitment, you're working through various different aspects on commercial terms, permitting, land rights and interconnections to be able to get to a firm commitment that then goes into our backlog, which, as I stated earlier, stands at $535 million, up $71 million versus fourth quarter***.

---

[5] Defendants' authority is inapposite because the challenged statements had not put the alleged issue "at play." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (accurate earnings did not, by itself, convey sustainability of business model).

¶63; *De Vito*, 2018 WL 6891832, at *29 (describing transaction as stock sale misleadingly omitted that consideration was uncertain); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019) ("[b]y placing the nature of the Company's" conduct "in play," defendants acquired duty to disclose adverse facts). Defendants cannot profess to be involved in evaluating backlog and omit key details that undercut the health of that backlog.

By contrast, Defendants rely on cases that had disclosed the negative information that investors could use to discount otherwise accurate statements. *See, e.g.*, *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 179 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018) (results that heavily relied on counterfeiters was not misleading because defendants "supplied . . . all the information . . . needed to assess the reported financial results"); *Singh v. Schikan*, 106 F. Supp. 3d 439, 447 (S.D.N.Y. 2015) (because they provided the key details of two relevant drug trials, defendants need not disclose "the negative impact [that] differences" between those trials "would likely have on the study's findings and therefore on the drug's prospects"). Here, Defendants reported the Bridgelink Commodities contract but failed to disclose the financial troubles, thus they did not report the countervailing information to investors.

   **3.**    **Defendants Created A Misleading Impression About The Strength Of The Company's Business**

Touting a $181 million contract in Eos's backlog, while omitting there was a serious risk that Bridgelink Commodities could pay those amounts, was materially misleading. ¶¶62-63; *see, e.g.*, *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *4 (S.D.N.Y. June 21, 2021) (touting $840 million committed purchase order misleading by omission of problems with supplier); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986-87 (9th Cir. 2008) (backlog that included work "at serious risk of being cancelled altogether" actionable).

Defendants' omission of issues with Bridgelink Commodities led to the misleading

impression that Eos would become profitable from millions in revenue. ¶¶33-34 (analysts positing that Eos's growing backlog was "a testament to the viability of the company's technology"). In fact, ongoing litigation threatened the entire life of Bridgelink Commodities, obviating its contract with Eos. ¶60 (Bridgelink umbrella's "renewable energy business . . . will be destroyed" by asset forfeiture). Therefore, Defendants' backlog statements are misleading by omission of countervailing facts. *See, e.g.*, *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (statements of strong demand misrepresented by omission that it "happened on the back of vendor financing").

Defendants' arguments to the contrary must fail. *First*, the risk was not disclosed. Defendants half-heartedly claim they "made it abundantly clear that realization of revenue from any particular order in the backlog was *not* guaranteed." Def. Br. at 17 n.6 (citing Def. Ex. A). They cite to the Company's annual report for fiscal 2022, which was filed on February 28, 2023—*before* Bridgelink Power's assets were being seized in April 2023 and *before* the Class Period starts on May 9, 2023. Martens Decl., ECF 26-2, ¶4. Unsurprisingly, that document makes no mention of Bridgelink Commodities' financial failings. *See* Def. Br. at 17 n.6 (quoting that "actual results m[ight] differ" due to "failure to convert firm order backlog to revenue") (alteration in original). Nor do they cite any statement within the Class Period purporting to disclose the risk that Bridgelink Commodities would not pay Eos. *See id.*

*Second*, disclosing the risk does not require speculation.[6] *Cf.* Def. Br. at 16.  At the time of

---

[6] Thus, Defendants' slippery slope argument also fails. Plaintiffs do not seek to impose a "completely unworkable and counterproductive" standard requiring corporations to speculate about "future contractual performance." Def. Br. at 18 n.7. The fate of Eos's profitability hung on the balance of the $181 million contract with Bridgelink Commodities—which is why Defendants paraded it at every opportunity. ¶¶30-32, 35, 38-40, 44-47. On these facts, Defendants had a duty to disclose the risk. *See* Sec. IV.A.2, *infra*.

14

the challenged statements, Bridgelink Power had already defaulted, and Bridgelink Commodities' financial condition was already at risk. *Compare* ¶¶62-63 (misstatements in May 2023)*, with* ¶48 (parent defaulted in May 2022 and lender sued in April 2023). Contrary to Defendants' assertion, Plaintiffs do not rely on events after the class period to allege falsity. Def. Br. at 18 (citing ¶¶58-59, 61). Without question, Bridgelink Power had defaulted, and its assets were being seized at the time of Defendants' May 9 and 10, 2023 statements. *See* ¶48. The post-Class Period findings of joint and several liability are used to refute Defendants' argument that the parent's financial condition do not imperil Eos's customer—an argument that they have abandoned since the first motion to dismiss.

Despite Defendants' attempt to focus on whether Bridgelink Commodities will eventually pay Eos, then-existing problems increased the undisclosed risk of nonpayment and necessitated disclosure. *See, e.g.*, *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 3701095, at *2 (S.D.N.Y. Aug. 25, 2022) (backlog actionable because "[i]t is misleading to disclose expectations of future revenue while concealing present reasons – as opposed to future risks – why that revenue may never be realized").

*Third*, and relatedly, the risk had materialized. Bridgelink Commodities entered the 3-year deal with Eos in March 2022 for $150 million, which increased to $181 million in June 2022. ¶¶30, 35. Between June 2022 and the close of the Class Period, Defendants did not purport to report any revenue from its relationship with Eos. ¶¶39-40 ($5.9 million revenue for second quarter 2022); ¶¶44-45 ($6.1 million revenue for third quarter 2022); ¶¶46-47 ($17.9 million revenue for full year 2022); ¶51 (Eos "expects to record revenue of $0.2 million for the quarter ended June 30, 2023"). Indeed, two years into the contract, Bridgelink Commodities does not appear to have paid

15

Eos any amounts from these deals.[7] *Merck & Co.*, 2011 WL 3444199, at \*9-11 (drug safety rendered misleading by omission of serious, though unconfirmed, concerns about causal relationship between drug and cardiovascular events). Defendants rely on cases where, unlike here, the risk was disclosed and had not materialized. *See Laasko v. Endo Int'l, plc*, 2022 WL 3444038, at \*5 (D.N.J. Aug. 17, 2022) (pending opioid-related litigation was disclosed and company was vigorously defending itself, thus any liability therefrom was speculative); *Globus Med.*, 869 F.3d at 242-43 (risk of adverse effects on sales had not materialized after company terminated independent distributor).[8] At best, Defendants raise a factual dispute whether any reported revenue is traceable to Bridgelink Commodities. *In re Majesco Sec. Litig.*, 2006 WL 2846281, at \*6 (D.N.J. Sept. 29, 2006) (particularity "does not demand an exhaustive cataloging of facts").

### B.  The Complaint Raises A Strong Inference Of Scienter

#### 1.  Legal Standards

Scienter is sufficiently alleged when allegations give rise to a strong inference of "either reckless or conscious behavior." *See Avaya*, 564 F.3d at 267, 280.  Recklessness encompasses "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 267, n.42.  Conscious behavior, meanwhile, exists when a plaintiff

---

[7] The Company reported $16.4 million revenue for fiscal 2023, which pales in comparison to the $89.8 million cost of goods sold. https://investors.eose.com/news-releases/news-release-details/eos-energy-enterprises-reports-fourth-quarter-full-year-2023. That is, Eos was not profitable, and its "Path to Profitability" no longer touts Bridgelink Commodities. *See id.*

[8] Defendants claim that a duty to disclose only arises when the contract has been terminated or repudiated. Def. Br. at 17. This is a hopelessly strawman argument because "[t]he Complaint does not allege that Bridgelink Commodities ever repudiated its contractual obligations to Eos." *Id.* In any event, those cases disclosed the uncertainty about the relevant contractual relationship. *See, e.g.*, *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at \*13 (S.D.N.Y. Aug. 1, 2017) ("Express Scripts disclosed on its investor call the uncertainty with respect to the timetable for the negotiations"). Defendants did not.

"specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001).

An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely as* any plausible opposing [non-culpable] inference." *Tellabs*, 551 U.S. at 324, 328 (emphasis in original). An inference of scienter need not be *more* likely than any non-culpable inference; in the face of equally compelling inferences, a tie goes to the plaintiff. *Id.* at 324 ("[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"). Moreover, scienter can be inferred from "circumstantial evidence." *Avaya*, 564 F.3d at 276. On Defendants' motion, the key inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310. As set forth below, Plaintiffs' allegations, taken together and read holistically, are adequate to allege a strong inference of scienter.

## 2. Defendants Knew Or Recklessly Disregarded Critical Facts Undermining Their Public Statements

Defendants publicly portrayed themselves as highly knowledgeable about Eos's existing orders and order backlog. They touted booked orders, announced newly booked orders, highlighted booked orders and order backlog in quarterly financial reports, and focused on order backlog in earnings calls. ¶¶23-24. They did so to counter the historic unprofitability of the Company. ¶23. And they were successful: analysts found each announcement of backlog increases as indicative of the "viability of the company's technology." ¶34. The contract with Bridgelink Commodities was repeatedly touted as the largest in the history of the Company. *E.g.*, ¶¶30, 35. Analysts regularly asked about backlog during the earnings calls, and the Individual Defendants would respond. ¶¶23, 33, 34. When, as here, defendants regularly speak to investors

and analysts about important topics, it can be inferred that the defendants were knowledgeable about those topics. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) (finding it "highly improbable" that defendant did not inquire into basis for his statements).

Defendants claimed to routinely "assess the health of our reported backlog," which assessment would have uncovered relevant omitted facts. Defendant Kroeker stated:

> Each quarter, we assess the health of our reported backlog. Doing so requires us to exercise judgment about uncertain factors. We sometimes come to the view that a project that was booked in the past is unlikely to materialize or a change order has been executed, in which case, we may adjust our backlog. This assessment has resulted in projects being removed from our backlog in each of the last 2 quarters.

¶¶24-25. This assessment of the Company's backlog, at a minimum, should have included communicating with Mr. Cole Johnson, who led Bridgelink Commodities and the other entities in the Bridgelink umbrella, because that was by far the largest component of the backlog. ¶¶55-57.

Defendants overstate the reasonable steps they should have taken, claiming they cannot be expected to monitor "every court docket in the country just in case litigation involving a customer unexpectedly pops up."[9] Def. Br. at 23. Not so. Eos had just 13 customers in its backlog. ¶25. Defendants do not, and cannot, dispute that Bridgelink Commodities was the largest customer in that backlog. Quarterly evaluation of the backlog, as Defendants claimed to conduct, requires ensuring that the largest customer Eos ever had could still pay for its contracts; otherwise, it was reckless for Defendants to tout the $181 million contract at every chance if they had no reasonable basis to believe the customer would pay. Demonstrating the ease of their access to information, Defendants reported—within hours of the Iceberg report—that Bridgelink Commodities

---

[9] Defendants' argument is wholly inconsistent with their loss causation argument. *See* Def. Br. at 28. By Defendants' logic, the investing public should have been monitoring the public dockets for each of Eos's customers, yet the Company's executives whose job it was to know (and who claimed to routinely assess) backlog could remain oblivious to the financial troubles of Eos's largest customer.

18

"reconfirmed today that . . . it is actively seeking financing" for its contract with Eos. ¶51. As such, Defendants knew or had access to information that undermined their public statements. Such allegations are enough to allege recklessness. *Campbell Soup*, 145 F. Supp. 2d at 599 (plaintiffs may "state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements").

Moreover, in the face of well-publicized accusations of inaccurate backlog before the Class Period, it would have been severely reckless for the Individual Defendants *not* to have monitored its largest customer's ability to pay. Well-before the Class Period, an Iceberg report had already alleged that an incredible surge in Eos's order book was attributable to companies that were unlikely to honor their obligations because they lacked sufficient funds. ¶¶26-27; *see also* ¶28 (resulting in 14% stock drop). As a result, Defendants were on notice that they should substantiate their reported backlog. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("[A]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of…recklessness.").[10]  In sum, "the most powerful evidence of scienter is the content and context of [Defendants'] statements[.]" *Inst. Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009).[11]

---

[10] Defendants characterize the connections between Bridgelink Power and Bridgelink Commodities as "an elaborate chain of reasoning," but they fail to identify any flaw in that logic. *See* Def. Br. at 23. They are related companies run by the same people, and orders for one were to be used for the projects of the other. *See* Sec. II.D, *supra*.  Likewise, Defendants claim that even if they had conducted a sufficient investigation into Bridgelink it would have led to an incorrect conclusion because "there is no allegation … Bridgelink Commodities orders were imperiled." Def. Br. at 24.  This argument is belied by the facts, including the intertwined nature of the Bridgelink entities and that Bridgelink Commodities has not fulfilled its orders.  Regardless, the allegations in the Complaint must be accepted as true on a motion to dismiss. *See Ashcroft*, 556 U.S. at 677.

[11] The Individual Defendants' scienter can be imputed to Eos.  *See Avaya*, 564 F.3d at 251-52 ("Although Shareholders' Complaint focuses on the statements of McGuire and Peterson, liability for these statements, if they were fraudulent, can also be imputed to Avaya because a corporation is liable for statements by employees who have apparent authority to make them."); *Allegheny*

19

### 3. The Company's Booked Orders Were A Core Operation Of The Company

"[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 654 (E.D. Pa. 2015); *Campbell Soup*, 145 F. Supp. 2d at 599 ("knowledge may be imputed to individual defendants when the disclosures involve the company's core business.") (collecting cases).

Selling zinc-based energy storage solutions is the Company's sole purpose and since the Company was not profitable, the Company's booked orders were the primary means to show market interest in the Company's products. ¶¶21, 23. In fact, the Company's backlog was used by Defendants to raise funds and increase the stock value. ¶¶23-24. As such, Eos's executives were finely attuned to the details of the transactions that were announced by the Company and were included in the Company's order backlog, or they were severely reckless if they were not. *Avaya*, 564 F.3d at 268 (recognizing a "core operations inference" supports scienter when securities fraud alleged related to core matters of central importance to a company); *see also Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 556 (D.N.J. 2010) ("[A] person's status as a corporate officer, when considered alongside other allegations, can help support an inference

---

*Cnty. Emps' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 234 (E.D. Pa. 2021) ("Scienter can be imputed to the corporation through basic agency principles or through the corporate scienter doctrine."). In the event that Defendants argue the Individual Defendants did not make Eos's misstatements – which clearly, they did – Eos would still be liable for its misleading backlog statements. *See* ¶82; *Allegheny Cnty.*, 532 F. Supp. 3d at 237 (Corporate scienter appropriate where "high-ranking corporate officials were personally engaged in the details of the project, making it highly unlikely that the unattributed statements were rogue pronouncement by employees lacking authority to speak on the corporation's behalf."); *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *17 (W.D. Pa. May 18, 2023) (similar).

that this person is familiar with the company's most important operations.").

This is particularly the case when the Bridgelink contract constituted such a large percentage of the Company's backlog: nearly 75% of Eos's backlog at the time the first contract was entered and 45% of the Company's backlog at the end of the Class Period. *See* ¶¶3, 51; *Yannes*, 2021 WL 2555437, at *5 (inferring knowledge of problems with "exceptionally important" supply contract); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *12 (D.N.J. Aug. 6, 2019) (scienter well-pleaded where misrepresentations concerned three drugs constituting "substantial portion" of revenues and operations).[12]  That Defendants publicly discussed the backlog as important to the company further supports scienter. *In re Enzymotec*, 2015 WL 8784065, at *18 (scienter inferred where "matter at issue [wa]s central to the core business of the Company,[ ] about which Defendants spoke regularly").

### 4.      Defendants Fail To Present A More Compelling Inference

When read holistically, Plaintiff's allegations support a strong inference of scienter. Faced with this reality, Defendants make a series of specious arguments, claiming the Complaint devotes just three paragraphs to scienter (it does not)[13] and that confidential witnesses or other documentary evidence is required (it is not)[14].

---

[12] "[T]he magnitude of the fraud, while not determinative of scienter, is probative of it." *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 506 (W.D. Pa. 2002); *see also Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *21 (D.N.J. July 27, 2018) (size of the scheme supports inference of scienter).

[13] Defendants themselves cite to other portions of the Complaint in their scienter argument, demonstrating their understanding that the scienter allegations are not limited to those in the "Additional Scienter Allegations" section. *See* Def. Br. at 23 (citing to ¶¶55-61); 24 (citing to ¶¶ 20, 29, 81); 25 (citing to ¶¶24-25).

[14] Plaintiff is not required to plead facts that can only be attained through discovery. *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 137 (S.D.N.Y. 2001) (fraud pleadings do not require specificity that can be achieved only through discovery); *In re Majesco Sec. Litig.*, 2006

The most reasonable inference from the alleged facts is that, after the Company had touted and had the market focus on its backlog, Defendants did not want to have to disclose that the Company's largest customer (which comprised almost half of the backlog) was in legal trouble that undermined its ability to pay Eos.  This is likely because such a disclosure would (and did) cause a massive decline in the Company's stock and made it harder for the unprofitable Eos to raise needed funds.

Defendants do not attempt to offer any competing inference.  *See* Def. Br. at 27.  Thus, the Court need not conduct any balancing of inferences: there is no competing inference to weigh. Plaintiff's requested inference should be considered strong because it is "cogent and compelling" and it is more plausible than any competing inference.  *Tellabs*, 551 U.S. at 324, 328.

## C.    The Complaint Adequately Alleges Loss Causation

"Loss causation is a causal connection between the material misrepresentation or omission and the loss suffered."  *Urban Outfitters*, 103 F. Supp. 3d at 655.  This causal connection can be pled by alleging (i) a corrective disclosure, or (ii) "the materialization of a concealed risk" that causes a stock price decline.  *In re Wilmington Trust Sec. Litig.*, 29 F. Supp. 3d 432, 450 (D. Del. 2014).[15]  Under either approach, "the exposure of the alleged fraud need not occur in a single, all-encompassing corrective disclosure; instead, the truth can be revealed through a series of partial corrective disclosures."  *Urban Outfitters*, 103 F. Supp. 3d at 655-56; *In re Vivendi Universal, S.A.*

---

WL 2846281, at *6 (D.N.J. Sept. 29, 2006) (particularity "does not demand an exhaustive cataloging of facts").

[15] *See also De Vito*, 2018 WL 6891832, at *39, n.37 ("The ultimate loss causation inquiry under either the corrective disclosure theory or the materialization of a concealed risk theory is the same: whether a 'misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'")

22

*Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) ("For an event to qualify as a materialization of the risk, it need only disclose part of the truth that was previously concealed by the fraud.").

Loss causation is not subject to any heightened pleading requirements. Instead, under Rule 8(a), all that is required is that plaintiff provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 181 n.24 (3d Cir. 2001) ("to establish loss causation, a claim must demonstrate that the fraudulent conduct proximately caused or substantially contributed to causing plaintiff's economic loss."); *In re Galena Biopharma, Inc. Sec. Litig.*, 2019 WL 5957859, at *18 (D.N.J. Nov. 12, 2019) ("A plaintiff need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss for loss causation; rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2)").[16] "The Third Circuit has stated that loss causation is ordinarily an issue for the trier of fact." *De Vito*, 2018 WL 6891832, at *40 (D.N.J. Dec. 31, 2018) (citing *EP Medsystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 884 (3rd Cir. 2000)).

Here, the Complaint pleads two corrective disclosures and/or partial materializations of concealed risks on July 27, 2023, in which the truth about Eos's backlog and Bridgelink Commodities inability to pay for its orders was revealed (and confirmed by Eos). Each of these partial disclosures/materializations of the concealed risk were accompanied by a precipitous fall in Eos's stock price. ¶¶50-53; Sec. II.C, *supra*. These allegations demonstrate loss causation because they provide Defendants with ample notice of "a causal connection between the material

---

[16] *See also Pharmanet*, 720 F. Supp. 2d at 558 (same); *In re Eros Int'l PLC Sec. Litig.*, 2021 WL 1560728, at *15 (D.N.J. Apr. 20, 2021) (same). As such, Defendants citations to cases in other circuits where the heightened pleading standard of Rule 9(b) applies to loss causation are inapposite.

misrepresentation and the loss." *Dura*, 544 U.S. at 342.

Defendants claim that the Iceberg report cannot constitute a corrective discloser because "it is based solely on public information" and as such "did not reveal any new information to the market." *See* Def. Br. at 30. This is incongruous with Defendants' position that their own review of legal filings would have led to an incorrect conclusion. *See* Def. Br. at 24. But, even if the Iceberg report was based on public information,[17] the report itself provided new information to the market. Specifically, Iceberg's analysis of these filings revealed (for the first time) that the Bridgelink Power litigation imperiled Bridgelink Commodities' ability to pay for (and its need for) Eos's products. As such, the disclosure of these facts was new information, constituting a loss causation event. *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at \*13 (S.D.N.Y. 2023) (rejecting that third party analysis of already-public financial information cannot contribute new information and holding that plaintiffs can plead a short-seller report containing such analysis as a corrective disclosure); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at \*8 (S.D.N.Y. 2020) (holding short-seller report could constitute a corrective disclosure because it provided several new pieces of information to the market although it otherwise consisted of public information); *In re Winstar Commc'ns*, 2006 WL 473885, at \*15 (S.D.N.Y. Feb. 27, 2006) ("The claimed ability of Asensio to arrive at its findings by an examination of the publicly reported

---

[17] While not an issue that needs to be decided on this motion, Defendants are wrong that legal filings are automatically generally known to the investors. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 185 F. Supp. 2d 389, 402 (S.D.N.Y. 2002) (news article in one publication was not widely disseminated, thus did not alter the materiality of the alleged misstatements and omissions); *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 140 (S.D.N.Y. 2021) (finding that the position that Defendants "can make misleading statements about anything, provided that the actual corrective facts are located somewhere in the public record…"is obviously untenable and unsupported by law."); *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 688 (S.D.N.Y. 2004) ("sporadic press reports or reports published in other contexts may 'not be considered to be part of the information that was reasonably available' to investors.").

financials does not mean that a reasonable investor could have drawn those same conclusions based on the total mix of the available information.").[18]

Moreover, the fact that the price of Eos's stock declined after the Iceberg report was issued demonstrates that its findings revealed new information. *In re Winstar Commc'ns*, 2006 WL 473885, at *15 ("There is no basis to conclude, as a matter of law, that the findings in the Asensio reports were already reflected in the price of Winstar securities. In fact, plaintiffs' allegations that the price of Winstar's stock fell in the immediate wake of the issuance of those reports belies such a conclusion.").[19] If the market were aware of the risk to the Company from the legal issues facing Bridgelink Power, then the stock would have not declined 23.9% upon the issuance of the Iceberg report. ¶50; *In re Bear Stearns Cos., Inc. Sec., & ERISA Litig*., 763 F. Supp. 2d 423, 483-84 (S.D.N.Y. 2011) ("precipitous declines" in stock once truth became known demonstrated loss causation).

Defendants dispute the characterization that the Company admitted Bridgelink Commodities lacked sufficient funds and claim Eos's statements are not corrective.[20] But their

---

[18] Courts in this Circuit have even held that the market may learn the truth about a defendant's misrepresentation from analysts' questioning of corporate disclosures. *Urban Outfitters*, 103 F. Supp. 3d at 656 (collecting cases); *W. Palm Beach Police Pension Fund v. DFC Global Corp.*, 2015 WL 3755218, at *17 (E.D. Pa. June 16, 2015) (holding same). If an analysis of Defendants' own public statements can still be corrective, an analysis of third-party, public information is also corrective.

[19] As such, Defendants' citation to numerous cases where analyst reports did not actually provide any new information to the market are inapposite. *See, e.g*., Def. Br. at 19 (citing *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 71 (D. Del. 2020) and *Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187, 191 (S.D.N.Y.)).

[20] Defendants further argue that the fact that the Complaint "does not allege that Bridgelink Commodities has in any way failed to meet its purchase commitments" somehow negates loss causation. Def. Br at. 32-33. This completely ignores that Bridgelink Commodities has still not purchased substantial amounts of Eos products, let alone anywhere near the $181 million; if anything, this confirms the Iceberg report's findings and the Company's admission that Bridgelink Commodities did not have financing.

argument is belied by the 14.7% stock drop on the Company's revelations. ¶53. Regardless, how the market viewed the Company's disclosure is a question of fact that is inappropriate to decide on a motion to dismiss. *Wilmington*, 29 F. Supp. 3d at 450 ("Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact.").

In sum, all that is required at the pleading stage is that the plaintiff provide the defendant "with some indication of the loss and the causal connection that he has in mind." *De Vito*, 2018 WL 6891832, at *40. Plaintiff has more than done this by alleging that the two corrective disclosures revealed new information to the market, causing Eos's stock to decline.

## D. Plaintiff Adequately Alleges Control Person Liability

"Section 20(a) of the Securities Exchange Act of 1934 creates a cause of action against individuals who exercise control over a corporation that has committed a violation of Section 10(b)." *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, C.A. No. 13-6731, 2015 WL 3755218, at *19 (E.D. Pa. June 16, 2015) (citing 15 U.S.C. § 78t(a)). Thus, "liability under Section 20(a) is derivative of an underlying violation of Section 10(b)." *Urban Outfitters*, 103 F. Supp. 3d at 657 n.6. Defendants contest control person liability under Section 20(a) only on the ground that there is no primary violation. Def. Br. at 33. Because, as shown in the preceding sections herein, Plaintiff adequately pleads a claim under Section 10(b), a Section 20(a) claim is also adequately pleaded. *Urban Outfitters*, 103 F. Supp. 3d at 657.

## V. CONCLUSION

For all the reasons stated herein, Plaintiff requests that the Court deny Defendants' motion to dismiss in its entirety. If the Court is inclined to grant, in whole or in part, Defendants' motion, Plaintiff respectfully requests that dismissal be without prejudice and with leave to amend to cure any defects via an amended pleading. *See* Fed. R. Civ. P. 15(a)(2) (leave to amend should be freely given); *Junker v. Med. Components, Inc.*, 2015 WL 12806501, at *3 n.1 (E.D. Pa. May 20,

2015) ("The Third Circuit has adopted a liberal approach to the amendment of pleadings to ensure that 'a particular claim will be decided on the merits rather than on technicalities.'") (quoting *Abbott Labs. v. Johnson & Johnson, Inc.*, 524 F. Supp. 2d 553, 557 (D. Del. 2007)). This is particularly the case here where Plaintiff has not been given the opportunity for a judicial decision about the sufficiency of his allegations. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 190-91 (2d Cir. 2015) (emphasizing the "liberal spirit" of Rule 15 and warning against dismissal with prejudice prior to plaintiffs being given "the benefit of a ruling" that details the "precise defects" in their pleading).[21]

Dated: May 6, 2024

By:    *s/ James E. Cecchi*
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiff and the Class*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Casey E. Sadler
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Lead Counsel for Lead Plaintiff and the Class*

---

[21] Defendants claim that dismissal should be with prejudice because Plaintiff has filed a second amended complaint ignores that Plaintiff has not been afforded an opportunity to amend following a judicial decision about the sufficiency of his allegations. *See* Def. Br. at 34.

27

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

28

## <u>PROOF OF SERVICE</u>

I hereby certify that on this 6th day of May, 2024, a true and correct copy of the foregoing

document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ James E. Cecchi*
James E. Cecchi
