Matthew T. Martens
   (NJ Bar No. 47541998)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(t) (202) 663-6000
(f) (202) 663-6363
matthew.martens@wilmerhale.com

*Attorney for Defendants*

Timothy Perla (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(t) (617) 526-6000
(f) (617) 526-5000
timothy.perla@wilmerhale.com

Charles C. Bridge (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8000
(f) (212) 230-8888
charles.bridge@wilmerhale.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WILLIAM HOUCK, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EOS ENERGY ENTERPRISES, INC., JOSEPH MASTRANGELO, and NATHAN KROEKER, <br><br> Defendants. | Case No. 2:23-cv-04113-JKS-MAH <br><br> **Motion Day**: Monday, June 3, 2024 <br><br> **REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> ORAL ARGUMENT REQUESTED |

**TABLE OF CONTENTS**

I.      THE COMPLAINT FAILS TO PLEAD FALSITY ........................................1

II.     THE COMPLAINT FAILS TO PLEAD SCIENTER ....................................6

III.    THE COMPLAINT FAILS TO PLEAD LOSS CAUSATION....................11

IV.     THE COURT SHOULD DISMISS WITH PREJUDICE ............................14

V.      CONCLUSION.......................................................................................15

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ...............................................................................12

*ACA Financial Guaranty Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008)..................................................................................14

*Berson v. Applied Signal Technology, Inc.*,
527 F.3d 982 (9th Cir. 2008) .................................................................................4

*Bishins v. CleanSpark, Inc.*,
2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) .........................................................12

*Central States, Southeast & Southwest Areas Pension Fund*
*v. Federal Home Loan Mortgage Corp.*,
543 F. App'x 72 (2d Cir. 2013) ...........................................................................12

*City of Cambridge Retirement System v. Altisource Asset*
*Management Corp*,
908 F.3d 872 (3d Cir. 2018) ..................................................................................7

*City of Pontiac General Employees' Retirement System*
*v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) ...................................................................3

*De Vito v. Liquid Holdings Group, Inc.*,
2018 WL 6891832 (D.N.J. Dec. 31, 2018) ...........................................................3

*F5 Capital v. Pappas*,
856 F.3d 61 (2d Cir. 2017) ..................................................................................15

*Fila v. Pingtan Marine Enterprise Ltd.*,
195 F. Supp. 3d 489 (S.D.N.Y. 2016) .................................................................12

*Hall v. The Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008) ...................................................................4

*Hall v. Johnson & Johnson*,
2019 WL 7207491 (D.N.J. Dec. 27, 2019) ......................................................3, 11

ii

*In re Alstom SA Securities Litigation*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ................................................................4

*In re Amarin Corp. PLC Securities Litigation*,
    2016 WL 1644623 (D.N.J. Apr. 26, 2016).........................................................5

*In re Chicago Bridge & Iron Co. N.V. Securities Litigation*,
    2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020)...................................................12

*In re Initial Public Offering Securities Litigation*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005) ..............................................................13

*In re Interpool, Inc. Securities Litigation*,
    2005 WL 2000237 (D.N.J. Aug. 17, 2005)........................................................9

*In re Merck & Co., Inc. Securities, Derivative & ERISA Litigation*,
    2011 WL 3444199 (D.N.J. Aug. 8, 2011) ..........................................................3

*In re NAHC, Inc. Securities Litigation*,
    306 F.3d 1314 (3d Cir. 2002) .....................................................................14, 15

*In re Ocugen, Inc. Securities Litigation*,
    2024 WL 1209513 (3d Cir. Mar. 21, 2024) ......................................................14

*In re Omnicom Group, Inc. Securities Litigation*,
    597 F.3d 501 (2d Cir. 2010) .............................................................11, 12, 13

*In re Romeo Power Inc. Securities Litigation*,
    2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022) ...................................................4

*In re Synchronoss Securities Litigation*,
    705 F. Supp. 2d 367 (D.N.J. 2010)....................................................................6

*Kelley v. Aerie Pharmaceuticals, Inc.*,
    2016 WL 3437603 (D.N.J. June 20, 2016).......................................................10

*Kelter v. Apex Equity Options Fund, LP*,
    2009 WL 2599607 (S.D.N.Y. Aug. 24, 2009) ..................................................14

*Key Equity Investors, Inc. v. Sel-Leb Marketing Inc.*,
    246 F. App'x 780 (3d Cir. 2007)........................................................................7

*Lau v. Opera Ltd.*,
    527 F. Supp. 3d 537 (S.D.N.Y. 2021) ..............................................................12

*Lopez v. CTPartners Executive Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016) ..............................................................15

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
    797 F.3d 160 (2d Cir. 2015) ..............................................................15

*Mallozzi v. Innovative Industrial Properties, Inc.*,
    2023 WL 6121499 (D.N.J. Sept. 19, 2023) .........................................................7

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ..............................................................13

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ..............................................................9

*Paxton v. Provention Bio, Inc.*,
    2022 WL 3098236 (D.N.J. Aug. 4, 2022) .........................................................11

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ..............................................................15

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013) ..............................................................15

*Rand-Heart of New York, Inc. v. Dolan*,
    812 F.3d 1172 (8th Cir. 2016) ..............................................................13

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. Jul. 27, 2018) .........................................................3

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
    499 F. Supp. 3d 49 (D. Del. 2020) ..............................................................12

*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
    545 F. Supp. 3d 120 (S.D.N.Y. 2021) ..............................................................12

*Takata v. Riot Blockchain, Inc.*,
    2020 WL 2079375 (D.N.J. Apr. 30, 2020) .........................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................7

*Winer Family Trust v. Queen*,
  503 F.3d 319 (3d Cir. 2007) ...............................................................10

*Yannes v. SCWorx Corp.*,
  2021 WL 2555437 (S.D.N.Y. June 21, 2021)......................................3

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C. § 78u-4(b)(2)(A)..........................................................................7

Fed. R. Civ. P.
  8 .........................................................................................................11
  9(b)......................................................................................................11

**OTHER AUTHORITIES**

Press Release, *Eos Energy Enterprises Reports Fourth Quarter & Full
  Year 2023 Financial Results and Provides 2024 Outlook*, Eos
  Energy Enters., Inc. (Mar. 4, 2024), https://investors.eose.com
  /news-releases/news-release-details/eos-energy-enterprises
  -reports-fourth-quarter-full-year-2023 ...............................................6

*Tout*, Cambridge Dictionary, https://dictionary.cambridge.org/us
  /dictionary/english/tout (last visited May 21, 2024) .........................2

v

Defendants respectfully submit this reply memorandum of law in support of their motion to dismiss [ECF No. 26] and in response to Plaintiff's memorandum in opposition [ECF No. 27] ("Opposition" or "Opp.").[1]

The Opposition confirms that this case reflects a flawed attempt to turn Eos's accurate report of its order backlog into securities fraud by inventing a legal obligation for companies, when reporting financial metrics, to comment on the likelihood of future performance by contractual counterparties. Because no such obligation exists, because Plaintiff fails to allege that Defendants were even contemporaneously aware of the information that they supposedly had a duty to disclose, and because the Iceberg Report at issue is not a corrective disclosure that can support loss causation, the Court should dismiss the Complaint with prejudice.[2]

## I.    THE COMPLAINT FAILS TO PLEAD FALSITY

Defendants' Opening Memorandum [ECF No. 26-1] ("Opening Memorandum" or "Mem.") demonstrated that the Challenged Statements—which,

---

[1]    Unless stated otherwise, all defined terms used in this brief have the same meaning as in Defendants' Opening Memorandum.

[2]    The Opposition tries to turn Plaintiff's decision to narrow his Complaint on its head by claiming that Defendants have "abandoned" arguments from the prior motion to dismiss. Opp. 2. In reality, the First Amended Complaint (ECF No. 16) contained numerous facially illogical challenges to statements that *predated* Bridgelink Power's alleged difficulties. After Defendants called attention to that illogic (*see, e.g.*, ECF No. 19-1 at 16-17), Plaintiff abandoned most of his case by filing the significantly narrowed Second Amended Complaint. The arguments that Defendants supposedly "abandoned" became irrelevant after that amendment.

on May 9 and 10, 2024, disclosed the backlog total—were not false or misleading because: (i) Plaintiff does not dispute the accuracy of the reported backlog total; (ii) there exists no legal obligation to comment on the likelihood that counterparties will in the future honor their orders; and (iii) instead, a disclosure obligation concerning an executory contract potentially arises only if the contract has been repudiated, which Bridgelink Commodities' orders have not.  Mem. 14-18.  Nothing in the Opposition undermines these points.

Plaintiff's principal response is to attack a strawman.  Plaintiff apparently recognizes that accurately reporting financial information is not securities fraud, so the Opposition repeatedly insists that Eos supposedly "touted" its backlog; Plaintiff then uses that supposed "touting" to try to manufacture a legal duty to comment on the supposed "risks" associated with the supposedly touted Bridgelink Commodities' orders.  *E.g.,* Opp. 1, 4, 11, 13, 16, 17.  The Court should ignore these characterizations and examine the disclosures.  Page 12 of the Opposition (which mirrors Compl. ¶¶ 62-63) shows what Eos actually did: report the quarter-end backlog total and describe in neutral terms the process for moving an order from a letter of intent to a firm commitment.  *See* Opp. 12.  The disclosures neither mention Bridgelink nor "tout" the backlog's strength.  *See id.*[3]

---

[3]    *Cf. Tout*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/tout (last visited May 22, 2024) (defining "tout" to mean "to

This is dispositive because the Opening Memorandum cited many cases for the well-established principle of law that a company, by accurately reporting financial information, does not create a duty to comment on or characterize it. Mem. 15-17. Plaintiff's cases are not to the contrary—*none* holds or suggests that an accurate report of financial information without more creates a duty to comment. *See generally* Opp. Instead, Plaintiff's cited cases either: (i) are facially irrelevant because they do not concern a challenge to a reported financial result,[4] or (ii) involve situations where, unlike here, the Defendant reported a result and then *chose to characterize* it falsely. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 362-63 (S.D.N.Y. 2012) (cited at Opp. 11) (challenge to statement that company had a "solid backlog"); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *12-13 (D.N.J. Jul. 27, 2018) (cited

---

advertise, talk about, or praise something or someone repeatedly, especially as a way of encouraging people to like, accept, or buy something").

[4]    *See Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *1, *6-8 (S.D.N.Y. June 21, 2021) (cited at Opp. 13) (sham company, shut down by the SEC, that boasted a fraudulent contract to purchase an implausibly high volume of COVID-19 test kits from vendor run by a felon); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019) (cited at Opp. 13) (statements about safety of baby powder); *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *1, *28-30 (D.N.J. Dec. 31, 2018) (cited at Opp. 12) (misrepresentations by fraudulent enterprise that was, in the court's words, "allegedly marred by self-dealing, undisclosed insider transactions, inflated customer counts, reliance on capital infusions from insiders, and dependence on a single related-party customer"); *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2011 WL 3444199, at *9-12 (D.N.J. Aug. 8, 2011) (cited at Opp. 16) (statements about drug safety).

3

at Opp. 11) (challenge to company's statement that it had "demonstrated a reliable ability to grow organically," and had "the ability to keep delivering"); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 450-53 (S.D.N.Y. 2005) (cited at Opp. 14) (challenge to company's commentary about cruise ship orders that concealed "vendor financing" arrangements, through which company itself "was the guarantor of loans used by [its customers] to purchase [its] ships"); *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 3701095, at *2 (S.D.N.Y. Aug. 25, 2022) (cited at Opp. 15) (company reported backlogged orders and projected how quickly they would be converted into revenue, but omitted obstacles to revenue conversion).[5]

It is unsurprising that Plaintiff cannot find legal support for a requirement that companies must comment on, speculate about, or disparage accurately reported financial information—such a requirement would be completely unworkable and have no limiting principle. *See* Mem. 15-18 & n.7. This case happens to concern a demand for disclosure concerning litigation involving Bridgelink Power—which Plaintiff claims posed risk to orders by Bridgelink

---

[5]   Plaintiff's two remaining cases establish the unremarkable proposition that if a projection or financial report is itself false, that is actionable. *See Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 230 (S.D.N.Y. 2008) (cited at Opp. 11-12) (challenge to accuracy of projection that company could open 700 new stores); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985-87 (9th Cir. 2008) (cited at Opp. 13) (backlog report was false because it included orders from government agencies that had issued stop-work instructions on the orders). Here, there is no allegation that Eos's reported backlog total was false.

Commodities.  But every executory contract carries *some* risk of future non-performance, which could be due to any number of issues (*e.g.,* financial, strategic, environmental, operational, or legal issues).  Under the disclosure standard Plaintiff seeks to create, one could readily imagine every company with a backlog being required to research and discuss speculative reasons why each customer might not honor orders.  To avoid that nonsensical result, the law limits the duty to comment about potential contractual non-performance to instances where a contract has been repudiated.  *See* Mem. 17-18 (citing cases).

Indeed, as highlighted in the Opening Memorandum (Mem. 18 n.7), the disclosure that Plaintiff demands would itself be problematic.  The Complaint does not allege that Bridgelink failed to honor its orders, so a disclosure during May 2023 that Bridgelink Commodities' orders were imperiled by Bridgelink Power's litigation would have *itself been false*.  The Opposition tries to muddy the waters by arguing that Bridgelink Commodities may not have honored their orders during 2023 because Eos does not "appear to have" realized significant revenue in 2023.  Opp. 15-16 & n.7.  As a threshold matter, the Complaint contains no such allegation, and so the allegation is not properly before the Court.  *See* Opp. 16 (making argument but not citing Complaint); *see also, e.g.*, *In re Amarin Corp. PLC Sec. Litig.* 2016 WL 1644623, at *11 n.10 (D.N.J. Apr. 26, 2016) (plaintiff may not amend complaint through opposition to motion to dismiss), *aff'd*, 689 F.

5

App'x 124 (3d Cir. 2017); *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 416 (D.N.J. 2010) (same).  Regardless, even if (as asserted in the Opposition but not the Complaint) Eos generated very little *overall* revenue in 2023, it would not make sense to posit that the cause was a problem with Bridgelink Commodities' orders—much less one related to the litigation involving Bridgelink Power.  Such a result would not be explainable by an issue with *one* customer whose orders accounted for approximately half of the backlog.  *See* Compl. ¶ 48.  Instead, as explained in the improperly cited press release, Eos was focused in 2023 on transitioning to a new battery technology, and so its primary focus was not on generating revenue.[6]

Thus, the Court should hold that Eos's undisputedly accurate report of the size of its backlog was not a false or misleading statement.

## II.    THE COMPLAINT FAILS TO PLEAD SCIENTER

A claim for securities fraud also requires scienter, *i.e.,* that the alleged misstatement was knowing or reckless.[7]  *See* Mem. 19-21.  The Complaint does not

---

[6]    *See* Press Release, *Eos Energy Enterprises Reports Fourth Quarter & Full Year 2023 Financial Results and Provides 2024 Outlook*, Eos Energy Enters., Inc. (Mar. 4, 2024), https://investors.eose.com/news-releases/news-release-details/eos -energy-enterprises-reports-fourth-quarter-full-year-2023.

[7]    Plaintiff admits that scienter requires either "conscious misbehavior" or "recklessness"—the latter meaning "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to defendant or is so obvious that the actor must have been aware of

come close to establishing the required strong inference of scienter; if anything, the undisputed timeline renders scienter implausible.[8]  The litigation against Bridgelink Power that Defendants supposedly should have disclosed arose on April 26, 2023, just *13 days* prior to the Challenged Statements.  The Complaint does not allege that anyone associated with Eos became aware of the litigation during that 13-day window (*see generally* Compl.), which takes "knowing" fraud off the table.  Thus, scienter is potentially present only if Defendants were reckless for not, during the 13-day window, identifying the Bridgelink Power litigation and inferring from it that orders by Bridgelink Commodities were imperiled.  The Opposition, however, never cogently explains what Defendants supposedly did or

---

it."  Opp. 16-17 (citations omitted); *see also Mallozzi v. Innovative Indus. Properties, Inc.*, 2023 WL 6121499, at *13 (D.N.J. Sept. 19, 2023) (misrepresentation must have been "so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception" (citation omitted)).

[8]     Plaintiff is incorrect that "applicable legal standards disfavor Defendants' motion."  Opp. 9.  The truth is just the opposite.  Congress enacted the PSLRA, in part, "[a]s a check against abusive litigation" that "impose[s] substantial costs on companies and individuals whose conduct conforms to the law."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007); *see also City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp*, 908 F.3d 872, 883-84 (3d Cir. 2018) (PSLRA reflects Congress's desire to protect "the very stability of our capital markets" by "forestalling meritless suits"); *Key Equity Invs., Inc. v. Sel-Leb Mktg. Inc.*, 246 F. App'x 780, 787 (3d Cir. 2007) ("[C]onclusory pleading [is] precisely what the PSLRA was intended to weed out.").  The PSLRA's "[e]xacting pleading requirements," including the requirement to plead a "'strong inference'" of scienter, are one way in which Congress sought to accomplish its goal.  *Tellabs*, 551 U.S. at 313-14 (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

failed to do during the 13 days that was reckless.  For instance, the Opening

Memorandum noted the absurdity of the idea that Defendants were obligated to

continually monitor all court dockets, just in case litigation involving a customer

(or, here, customer's affiliate) popped up.  Mem. 23-24.  Plaintiff responded by

disavowing that docket monitoring was required and now retreats to a generic

assertion that Eos should have been "communicating with Mr. Cole Johnson, who

led Bridgelink Commodities."  Opp. 18.  This suggestion raises more questions

than it answers,[9] and it is not remotely indicative of recklessness for Eos not to be

in communication with each customer every two weeks.

    Moreover, even if one allows the implausible leap that Defendants were

legally required to become aware of the Bridgelink Power litigation during a 13-

day window, Plaintiff's claim requires a further leap, *i.e.,* that Defendants were

*also* legally required to infer that litigation against Bridgelink Power might affect

pending orders by Bridgelink Commodities.  In that regard, the Complaint contains

an elaborate chain of reasoning as to why Plaintiff believes one might draw that

inference, *see* Compl. ¶¶ 55-61, and the Opposition claims that Defendants have

---

[9]    For instance, how should Defendants have known to call Mr. Johnson
between April 26 and May 9, 2023?  Or is Plaintiff's position that Defendants
needed to call Mr. Johnson (and apparently every other customer) every 13 days to
ensure they never missed a window in which, by happenstance, litigation was
filed?  And what sort of interrogation was required on those hypothetical biweekly
calls?  The issue here happened to be litigation, but it just as easily could have been
a host of other issues—including, for instance, financial or regulatory concerns.

8

failed to identify any "flaw in that logic," Opp. 19 n.10.  But the question is not whether one could construct a chain of reasoning connecting Bridgelink Power to Bridgelink Commodities—the question is whether it was *reckless* for Defendants not to infer that a claim against Bridgelink Power necessarily imperiled Bridgelink Commodities.  Fraud is not established, on a recklessness theory, simply by alleging that corporate officials failed to "present an overly gloomy or cautious picture" of their business operations.  *E.g.*, *In re Interpool, Inc. Sec. Litig.*, 2005 WL 2000237, at *12 (D.N.J. Aug. 17, 2005) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).

Plaintiff cannot bolster his failed attempt to plead scienter by observing that "[e]ach quarter" Eos "assess[es] the health of [its] reported backlog."  Opp. 18 (quoting Compl. ¶ 24).  Plaintiff tries to jump to the conclusion that this assessment would have been recklessly deficient if it did not uncover the Bridgelink Power litigation—and then instantly discern the risk that the litigation supposedly posed to Bridgelink Commodities.  *See* Opp. 18-19.  But the Complaint pleads no facts concerning Eos's periodic assessments of its backlog, such as when they occurred, what they entailed or should have entailed, or any other information needed to come close to pleading recklessness.  *See* Mem. 21-24.[10]

---

[10]    Moreover, the 13-day window during which Defendants would have needed to discover the Bridgelink Power litigation to be able to mention it in the

Finally, Plaintiff argues that there must be fraud because there exists no compelling, nonfraudulent inference from the allegations. *See* Opp. 21-22. Nonsense. The nonfraudulent inference is obvious and compelling: that Defendants, during a 13-day window between the Bridgelink Power suit and the Challenged Statements, simply did not became aware of the litigation, much less reach the (flawed) conclusion that the litigation would impact Bridgelink Commodities' orders. It is Plaintiff's proposed *fraudulent* inference that makes no sense*, i.e.,* that Defendants were somehow reckless for not taking unspecified steps to ensure that they were aware in essentially real time of any event that might potentially impact a customer, and then publicly speculating about potential future impacts (which, in this case, never came to fruition). *See Winer Fam. Tr. v. Queen*, 503 F.3d 319, 329 (3d Cir. 2007) (affirming rejection of inference that was "neither cogent, nor compelling, nor strong in light of competing inferences").

In sum, the Complaint comes nowhere close to crossing the very "high bar" that the PSLRA sets for pleading scienter. *Kelley v. Aerie Pharms., Inc.*, 2016 WL 3437603, at *9 (D.N.J. June 20, 2016).[11]

---

Challenged Statements (April 26-May 9) fell *in the middle* of a quarter. However, backlog totals are compiled at quarter-end (*i.e.,* March 31, June 30, etc.), so it would not make sense for the assessment to occur during the window.

[11]    The Opposition also rehashes (at 20-21) a "core operations" theory, *i.e.,* that because the Bridgelink order backlog was important, the Company's executives must have known about the Bridgelink Power litigation and the supposed problem

10

## III.    THE COMPLAINT FAILS TO PLEAD LOSS CAUSATION

The Opposition argues that the Complaint pleads loss causation by alleging "two corrective disclosures and/or partial materializations of concealed risks on July 27, 2023." Opp. 23.[12]  But a "negative characterization of already-public information," such as the Iceberg Report, cannot constitute a corrective disclosure. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).  Thus, courts regularly reject efforts to use short reports based on public information to establish loss causation.  *See* Mem. 28-31 & n.10 (collecting cases).

The Opposition tries to circumvent this body of law by citing a smattering of cases from the S.D.N.Y. in which plaintiffs survived dismissal by pleading that short reports (or other third-party analyses of public information) were corrective disclosures.  *See* Opp. 24-25.  Several of those cases pre-date 2010, the year of the

---

it raised for Bridgelink Commodities.  The Opening Memorandum (at 25-26 & n.8) disposes of this argument.  In short, the alleged importance of the backlog does not, without more, provide a cogent basis to infer that, during the 13-day window at issue, Defendants became aware of the information and then drew the conclusions that Plaintiff insists they needed to draw.

[12]    The Opposition argues that loss causation "is not subject to any heightened pleading requirements" and should be assessed under Rule 8, not Rule 9(b).  Opp. 23.  That misstates the law.  The Third Circuit has not decided which pleading standard applies, *see Paxton v. Prevention Bio, Inc.*, 2022 WL 3098236, at *18 n.23 (D.N.J. Aug. 4, 2022), and other courts of appeals are split, *see Hall*, 2019 WL 7207491, at *26-27 (observing that the Fourth, Seventh, Ninth, and Eleventh Circuits have held that Rule 9(b) applies).  Here, the Complaint's allegations are insufficient to meet either standard.  *See* Mem. 28 n.9.

Second Circuit's *Omnicom* decision, and thus "are no longer persuasive authority" (even in that Circuit) as to "the legal standard for loss causation."  *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 497 (S.D.N.Y. 2016).  And although some other cases post-date *Omnicom*,[13] the clear weight of authority is to the contrary: courts regularly conclude that "[a]lready-public information" publicized in a short report "cannot constitute a corrective disclosure for purposes of alleging loss causation."  *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 559 (S.D.N.Y. 2021) (holding that short report could not "constitute a corrective disclosure sufficient to allege loss causation"); *see also, e.g.*, *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 70-71 (D. Del. 2020) (same); *Fila*, 195 F. Supp. 3d at 496-97 (short report was "based solely on public information" and did not "'reveal

---

[13]    In addition, the Opposition's post-*Omnicom* cases are distinguishable.  In *Bishins v. CleanSpark, Inc.* (cited at Opp. 24), the analysis was influenced by uncertainty as to whether "district courts should apply *Omnicom* at the motion to dismiss stage."  2023 WL 112558, at *13 (S.D.N.Y. Jan. 5, 2023).  But the Second Circuit itself has not hesitated to apply *Omnicom* at the pleading stage.  *See, e.g.*, *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 179-80 & n.70 (2d Cir. 2020); *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013).  In the cited portion of *Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*, the court was not analyzing loss causation at all; it was analyzing falsity and rejecting the notion that companies "can make misleading statements about anything, provided that the actual corrective facts are located somewhere in the public record."  545 F. Supp. 3d 120, 140 (S.D.N.Y. 2021).  And in *Chicago Bridge & Iron*, a class-certification decision, the court found *Omnicom* inapplicable because the short reports revealed information that was "specific" and "not previously disclosed."  *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *8 (S.D.N.Y. Mar. 23, 2020).

some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint'" (quoting *Omnicom*, 597 F.3d at 511)).

The Opposition also contends (at 25-26) that the Challenged Statements necessarily revealed new information because Eos's stock price allegedly dropped soon after each statement. But an event that moves markets does not necessarily disclose securities fraud; "not every bit of bad news that has a *negative* effect on the price of a security necessarily has a *corrective* effect for purposes of loss causation." *Rand-Heart of New York, Inc. v. Dolan*, 812 F.3d 1172, 1180 (8th Cir. 2016) (emphasis added) (quoting *Meyer v. Greene*, 710 F.3d 1189, 1202 (11th Cir. 2013)); *see also In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (drawing same distinction between "*negative* effect[s]" and "*corrective* effect[s]" on stock prices). If pleading loss causation were as easy as identifying a stock drop, then courts would not regularly reject securities fraud claims premised on a successful short attack. *See* Mem. 28-31 & n.10.

Finally, to the extent that Plaintiff alleges that Eos's stock dropped because the market had not yet digested *public* information in the Iceberg Report, that theory cannot be reconciled with the efficient-market assumptions underlying the fraud-on-the-market theory through which he pleads reliance. *See* Mem. 31 n.12.

13

## IV.    THE COURT SHOULD DISMISS WITH PREJUDICE

The Opposition concludes with a token request for dismissal *without* prejudice, ostensibly because Plaintiff has not yet received "a judicial decision about the sufficiency of his allegations."  Opp. 27 & n.21.  But Plaintiff offers no specifics as to *how* he would amend.  *See In re Ocugen, Inc. Sec. Litig.*, 2024 WL 1209513, at *6 (3d Cir. Mar. 21, 2024) (explaining that district courts "need not grant leave to amend when the party seeking such leave does not attach a draft amended complaint to its motion or explain how it would amend the pleading"); *Takata v. Riot Blockchain, Inc.*, 2020 WL 2079375, at *18 n.20 (D.N.J. Apr. 30, 2020) (denying "cursory" and "threadbare" request that "fail[ed] to provide 'any indication of the particular grounds on which amendment [was] sought'"); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332-33 (3d Cir. 2002) (similar).  Plaintiff is not entitled to "an advisory opinion from the Court as to the [Complaint's] deficiencies," and the Court should deny his "vague request[]" for "leave to amend his complaint in the event of a dismissal."  *Kelter v. Apex Equity Options Fund, LP*, 2009 WL 2599607, at *10 (S.D.N.Y. Aug. 24, 2009); *see also Takata,* 2020 WL 2079375, at *18 n.20 ("[I]t is not the Court's responsibility to sift through the Complaint in order to identify those allegations that have been pled with particularity."); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008) (plaintiffs may not "deliberately wait in the wings" until a court finds their

14

complaint insufficient); *Pugh v. Trib. Co.*, 521 F.3d 686, 698 (7th Cir. 2008) ("Courts have rejected the argument that [plaintiffs are] entitled to wait and see what the district court said before making any changes to the complaint.").[14]

In any event, amendment would be futile because the Complaint's deficiencies are not curable. *See NAHC*, 306 F.3d at 1332-33 (affirming denial of leave to amend in light of PSLRA's "underlying policy considerations"). Having already amended twice—including once after seeing Defendants' initial motion to dismiss—Plaintiff should not receive yet another bite at the apple.[15]

## V.    CONCLUSION

The Court should dismiss the Complaint with prejudice.

---

[14]    Contrary to the Opposition's implication (at 27), *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160 (2d Cir. 2015), does not "require that a plaintiff receive, as a matter of course, repeated judicial decisions on the same motion." *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 43 (S.D.N.Y. 2016). The specific problem in *Loreley* was that the district court had taken the unusual step, at a pre-motion conference, of putting the plaintiffs to "a Hobson's choice: agree to cure deficiencies not yet fully briefed and decided or forfeit the opportunity to replead." *F5 Cap. v. Pappas*, 856 F.3d 61, 90 (2d Cir. 2017) (quoting *Loreley*, 797 F.3d at 191). Nothing of the sort occurred here.

[15]    Plaintiff concedes, as he must, that control-person liability is derivative of an underlying Section 10(b) violation. Opp. 26; *see Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013). His Section 20(a) claim thus fails. *See* Mem. 33.

15

Dated: May 22, 2024

Respectfully submitted,

**WILMER CUTLER PICKERING HALE AND DORR LLP**

*/s/ Matthew T. Martens*
Matthew T. Martens
   (NJ Bar No. 47541998)
2100 Pennsylvania Avenue NW
Washington, DC 20037
(t) (202) 663-6000
(f) (202) 663-6363
matthew.martens@wilmerhale.com

Timothy Perla (*pro hac vice*)
60 State Street
Boston, MA 02109
(t) (617) 526-6000
(f) (617) 526-5000
timothy.perla@wilmerhale.com

Charles C. Bridge (*pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8000
(f) (212) 230-8888
charles.bridge@wilmerhale.com

*Attorneys for Defendants*

16

## CERTIFICATE OF SERVICE

I certify that on May 22, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system. Counsel for all parties are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Matthew T. Martens*
Matthew T. Martens

17